UNITED STATES *v.* SPERRY CORP. ET AL.

No. 88–952.   Argued October 10, 1989—Decided November 28, 1989

WHITE, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the briefs were *Solicitor General Starr, Acting Solicitor General Bryson, Assistant Attorney General Bolton, Edwin S. Kneedler, David M. Cohen, Douglas N. Letter,* and *Abraham D. Sofaer.*

*John D. Seiver* argued the cause for appellees. With him on the brief were *Alan Raywid* and *Susan Paradise Baxter.**

JUSTICE WHITE delivered the opinion of the Court.

Section 502 of the Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, 99 Stat. 438, note following 50 U. S. C. § 1701 (1982 ed., Supp. V), requires the Federal Reserve Bank of New York to deduct and pay into the United States Treasury a percentage of any award made by the Iran–United States Claims Tribunal in favor of an American claimant before remitting the award to the claimant. We are asked to consider in this case whether § 502 violates the Just Compensation Clause or Due Process Clause of the Fifth Amendment[1] or the Origination Clause of Article I, § 7.[2]

## I

Appellees Sperry Corporation and Sperry World Trade, Inc. (hereinafter Sperry),[3] are American corporations that

---

*Briefs of *amici curiae* urging affirmance were filed for Chevron Corp. by *Charles G. Cole;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Edward J. Connor, Jr.*

[1] "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U. S. Const., Amdt. 5.

[2] "All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." U. S. Const., Art. I, § 7, cl. 1.

[3] Sperry World Trade, Inc., is a wholly owned subsidiary of Sperry Corporation. Subsequent to the commencement of this action, Sperry

entered into contracts with the Government of Iran prior to the seizure of the United States Embassy in Tehran on November 4, 1979. The details of the seizure of the Embassy and diplomatic personnel and the ensuing diplomatic crisis want no repetition here. We need address only the means eventually established by the Governments of the United States and Iran to resolve claims by American companies against Iran.

On November 14, 1979, President Carter issued Executive Order No. 12170, blocking the removal or transfer of all property of the Government of Iran subject to American jurisdiction. 3 CFR 457 (1980). One day later, the Secretary of the Treasury issued regulations invalidating any attachment affecting Iranian property covered by the Executive Order unless the attachment was licensed by the Secretary. 31 CFR § 535.203(e) (1980). The regulations provided that any such license could be "amended, modified, or revoked at any time." § 535.805. On November 26, 1979, the President granted a general license authorizing judicial proceedings against Iran but not the "entry of any judgment or of any decree or order of similar or analogous effect . . . ." § 535.504(b)(1). A subsequently issued regulation made clear that the President's license authorized prejudgment attachments. § 535.418.

As part of the resolution of the diplomatic crisis, the United States and Iran entered into an agreement embodied in two declarations of the Government of Algeria commonly referred to as the Algiers Accords (hereinafter the Accords). App. 29–42. The Accords provided for the establishment in The Hague of an international arbitral tribunal, known as the Iran–United States Claims Tribunal (hereinafter the Tribunal), to hear claims brought by Americans against the Government of Iran. The establishment of the Tribunal was to

---

Corporation merged with Burroughs Corporation. The successor corporation was renamed as UNISYS Corporation. Brief for Appellees 1, n. 1.

preclude litigation by Americans against Iran in American courts, so the United States undertook to terminate such legal proceedings, unblock Iranian assets in the United States, and nullify all attachments against those assets. *Id.*, at 30. To implement the Accords, President Carter issued a series of Executive Orders on January 19, 1981, revoking all licenses permitting the exercise of "any right, power, or privilege" with respect to Iranian funds and annulling all non-Iranian interests in Iranian assets acquired after the blocking order. Exec. Orders Nos. 12276–12285, 3 CFR 104–118 (1981). On February 24, 1981, President Reagan issued an Executive Order suspending all claims that "may be presented to the . . . Tribunal" and providing that such claims "shall have no legal effect in any action now pending in any court of the United States." Exec. Order No. 12294, 3 CFR 139 (1981). This Court upheld the revocation of the licenses and the suspension of the claims in *Dames & Moore* v. *Regan*, 453 U. S. 654 (1981).

Prior to the Accords, Sperry had filed suit against Iran in the United States District Court for the District of Columbia and had obtained a prejudgment attachment of blocked Iranian assets, but the Executive Orders sustained in *Dames & Moore* invalidated that attachment and prohibited Sperry from further pursuing its claims against Iran in any American courts. Sperry therefore filed a claim against Iran with the Tribunal and also began settlement negotiations with Iran. In February 1982, Sperry and Iran reached an agreement requiring the payment by Iran to Sperry of $2.8 million. The Government of Iran gave the settlement final approval on July 8, 1982.

Sperry and Iran then filed a joint application with the Tribunal, which was granted, to have the settlement entered as an "Award on Agreed Terms." The entry of the settlement provided Sperry with a significant benefit, for it gave the settlement agreement the status of an award by the Tribunal, and under the Accords, all awards of the Tribunal are "final

and binding" and are "enforceable . . . in the courts of any nation in accordance with its laws." App. 40. The entry of the settlement also enabled Sperry to make use of the mechanism established by the Accords and the implementing Executive Orders for the payment of arbitral awards. As part of the Accords, $1 billion of the unblocked Iranian assets had been placed in a Security Account in the Bank of England for the payment of awards. *Id.*, at 33. Awards made by the Tribunal in favor of American claimants are paid from the Security Account to the Federal Reserve Bank of New York, which then pays the awards to the claimants. See 47 Fed. Reg. 25243 (1982).

We come now to the heart of this dispute. The Accords provided that "[t]he expenses of the Tribunal shall be borne equally by the two governments." App. 41. On June 7, 1982, the Department of the Treasury issued a "Directive License" requiring the Federal Reserve Bank of New York to deduct 2% from each award certified by the Tribunal and to pay the deducted amount into the Treasury "to reimburse the United States Government for costs incurred for the benefit of U. S. nationals who have claims against Iran." 47 Fed. Reg. 25243 (1982). When the Federal Reserve Bank of New York received Sperry's award, it deducted the 2% charge over Sperry's protest, deposited the charge in the Treasury, and paid Sperry the balance of its award.

Sperry filed suit in the United States Claims Court, contending that the 2% charge was unconstitutional and was not (as the United States argued) authorized by the Independent Offices Appropriation Act, 1952 (IOAA), 65 Stat. 290, 31 U. S. C. § 483a (1976 ed.).[4] The Claims Court held in an oral ruling on May 1, 1985, that the Directive License violated IOAA. App. to Juris. Statement 26a–51a. Congress reacted swiftly by enacting § 502, which specifically requires the assessment of a charge against successful American

---

[4] Title 31 was recodified in 1982, and IOAA is now to be found at 31 U. S. C. § 9701 (1982 ed.).

claimants before the Tribunal and directs the Federal Reserve Bank of New York to deduct from Tribunal awards paid out of the Security Account an amount equal to 1½% of the first $5 million and 1% of any amount over $5 million. Section 502(a) states that these charges are to be deducted "as reimbursement to the United States Government for expenses incurred in connection with the arbitration of claims of United States claimants against Iran before [the] Tribunal and the maintenance of the Security Account established pursuant to the [Accords]." Congress made § 502 effective retroactive to June 7, 1982, the date on which the Treasury had issued the Directive License struck down by the Claims Court. See § 502(d).

Sperry renewed its challenge to the deduction in the Claims Court, arguing that the 1½% deduction authorized by § 502 was unconstitutional. The Claims Court rejected the constitutional claims and dismissed Sperry's suit. 12 Cl. Ct. 736 (1987). The Court of Appeals for the Federal Circuit reversed and held that § 502 was unconstitutional as it caused a taking of Sperry's private property without just compensation. 853 F. 2d 904 (1988). The Court of Appeals likened the 1½% deduction by the Federal Reserve Bank of New York to the permanent physical occupation by the Government of private property which, this Court held in *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 441 (1982), is always a "taking" requiring just compensation. The Court of Appeals was unmoved by the United States' argument that there was no taking given the benefits that Sperry had obtained from the Tribunal: "[W]e do not see the benefit of the Tribunal to Sperry when prior to the Accords it had secured the attachment of Iranian assets sufficient to cover its eventual award and, had the President not suspended American claims, would have had no need for the Tribunal." 853 F. 2d, at 908.

The United States invoked our appellate jurisdiction under the version of 28 U. S. C. § 1252 (1982 ed.) in effect before its

amendment in 1988.[5]   We noted probable jurisdiction, 489 U. S. 1009 (1989), and we now reverse.

## II

Sperry argues that the deduction is a part of Congress' scheme to shift to American claimants against Iran those costs of settling the diplomatic crisis that should have been borne by the Nation as a whole.   As we see it, however, Sperry has not identified any of its property that was taken without just compensation.   To the extent the Court of Appeals' decision may be read as concluding that Sperry suffered a taking of its property because its prejudgment attachment against Iranian assets was nullified by the Executive Orders implementing the Accords, see 853 F. 2d, at 907, that conclusion is incorrect; we held in *Dames & Moore* v. *Regan,* 453 U. S., at 674, n. 6, that American litigants against Iran had no property interest in such attachments.   Nor did Sperry suffer the deprivation of its claim against Iran. Sperry presented its claim to the Tribunal and settled the claim for a substantial sum.[6]   And we note that Sperry makes no claim that the gross amount of the award was less

---

[5] Section 1252 permitted a direct appeal to this Court from "an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States . . . is a party."   Congress eliminated most of this Court's appellate jurisdiction, including that based on § 1252, in Public Law 100–352, 102 Stat. 662, which was enacted on June 27, 1988.   However, § 7 of Public Law 100–352 provides that the statute "shall take effect ninety days after the date of the enactment of this Act," *i. e.,* on September 25, 1988, and shall not "affect the right to review or the manner of reviewing the judgment or decree of a court which was entered before such effective date."   *Id.,* at 664.   The judgment of the Court of Appeals was entered on August 10, 1988, before the effective date of Public Law 100–352.   The appeal is therefore proper.   See also *Duquesne Light Co.* v. *Barasch,* 488 U. S. 299, 307, n. 4 (1989).

[6] Sperry's ability to pursue its claim against Iran in another forum distinguishes this case from *Gray* v. *United States,* 21 Cl. Ct. 340 (1886). In the treaty at issue in *Gray,* the United States canceled American claims against France altogether.   *Id.,* at 393.

than what would have been recovered in ordinary litigation and that being forced to take the lesser amount was an unconstitutional taking of property. The case thus turns only on the constitutionality of the deduction.

As for the deduction itself, the United States urges that it is not a taking at all but is a reasonable "user fee" assessed against claimants before the Tribunal and intended to reimburse the United States for its costs in connection with the Tribunal. Sperry responds that the § 502 charge cannot be upheld as a user fee because there has been no showing that the amount of the deduction approximates the cost of the Tribunal to the United States or bears any relationship to Sperry's use of the Tribunal or the value of the Tribunal's services to Sperry. None of Sperry's submissions is persuasive.

Section 502(a) specifically states that the deductions are made as "reimbursement to the United States Government for expenses incurred in connection with the arbitration of claims of United States claimants against Iran before [the] Tribunal and the maintenance of the Security Account . . . ." Given especially this specific declaration by Congress that the deductions are intended to reimburse costs incurred by the United States, the burden must lie with Sperry to demonstrate that the reality of § 502 belies its express language before we conclude that the deductions are actually takings. Cf. *Pittsburgh* v. *Alco Parking Corp.*, 417 U. S. 369, 375–376 (1974). That burden has not been met.

This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services. Nor does the Government need to record invoices and billable hours to justify the cost of its services. All that we have required is that the user fee be a "fair approximation of the cost of benefits supplied." *Massachusetts* v. *United States,* 435 U. S. 444, 463, n. 19 (1978). In that case, the Court upheld a flat registration fee assessed by the Federal Government on civil aircraft, including aircraft owned by the States, against a challenge that the fee

violated the principle of intergovernmental tax immunity. In holding that the registration charge could be upheld because it was a user fee rather than a tax, the Court rejected Massachusetts' argument that the "amount of the tax is a flat annual fee and hence is not directly related to the degree of use of the airways." *Id.*, at 463. The Court recognized that when the Federal Government applies user charges to a large number of parties, it probably will charge a user more or less than it would under a perfect user-fee system, but we declined to impose a requirement that the Government "give weight to every factor affecting appropriate compensation for airport and airway use," *id.*, at 468.[7]

---

[7] Sperry urges, however, that *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266 (1987), compels invalidation of the deduction here. In that case, the Court rejected Pennsylvania's argument that flat truck registration fees and axle taxes did not violate the Commerce Clause because they were imposed as user fees to reimburse Pennsylvania for the costs of highway maintenance. The Court stated that "Pennsylvania's flat taxes . . . discriminate against out-of-state vehicles by subjecting them to a much higher charge per mile traveled in the State, and they do not even purport to approximate fairly the cost or value of the use of Pennsylvania's roads." *Id.*, at 290.

The reasoning of *American Trucking Assns.* cannot be extended outside the context of the Commerce Clause. The Court there was faced with particular constitutional restrictions on fees and taxes not present in this case, that a fee charged by a State not discriminate against out-of-state vehicles and not place an undue burden on interstate commerce. The flat taxes were objectionable because, even though they were facially neutral, their effect was to subject out-of-state vehicles, which traveled on average much fewer miles inside Pennsylvania than did in-state vehicles, to a much higher charge per mile traveled. The taxes failed what we have described as the "internal . consistency" requirement of the Commerce Clause. *Id.*, at 282–287; see also *Tyler Pipe Industries, Inc.* v. *Washington State Department of Revenue*, 483 U. S. 232, 247 (1987). There is no similarly exacting requirement under the Just Compensation Clause. On the contrary, the Just Compensation Clause "has never been read to require the . . . courts to calculate whether a specific individual has suffered burdens . . . in excess of the benefits received" in determining whether a "taking" has occurred. *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 491, n. 21 (1987).

The deductions authorized by § 502 are not so clearly excessive as to belie their purported character as user fees. This is not a situation where the Government has appropriated all, or most, of the award to itself and labeled the booty as a user fee. Cf. *FCC* v. *Florida Power Corp.*, 480 U. S. 245, 253 (1987); *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155 (1980).[8] We need not state what percentage of the award would be too great a take to qualify as a user fee, for we are convinced that on the facts of this case, 1½% does not qualify as a "taking" by any standard of excessiveness. This was obviously the judgment of Congress and we abide by it.[9]

---

[8] In *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, the Court struck down a Florida statute appropriating interest on funds deposited into a court registry by an interpleader complainant. Florida law provided for both the deduction of a small percentage of the interpleader funds as a fee for services rendered by the clerk of the court and the deduction of interest earned on the funds. "It is obvious that the interest was not a fee for services, for any services obligation to the county was paid for and satisfied by the substantial fee charged . . . and described specifically . . . as a fee 'for services' by the clerk's office." 449 U. S., at 162. We failed to discern any justification for the deduction of the interest other than the bare transfer of private property to the county. We expressed "no view as to the constitutionality of a statute that prescribes a county's retention of interest earned, where the interest would be the only return to the county for services it renders," *id.*, at 165, a situation more analogous to the case at bar.

[9] Sperry argues, however, that we should not even consider the amount deducted by the Federal Reserve Bank of New York because the deduction was akin to a "permanent physical occupation" of its property and therefore was a *per se* taking requiring just compensation, regardless of the extent of the occupation or its economic impact. See *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 441 (1982). The Court of Appeals agreed with Sperry. 853 F. 2d 904, 906–907 (CA Fed. 1988). It is artificial to view deductions of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible. No special constitutional importance attaches to the fact that the Government deducted its charge directly from the award rather than requiring Sperry to pay it separately. If the deduction in this case were a physical occupation requiring just compensation, so would be any fee for services, including a filing fee that must be paid in advance. Such a rule would be an extravagant extension of *Loretto*.

Sperry complains that the United States has taken its property by charging it for the use of procedures that it has been forced to use, or at least that it would rather not have used. But as we have explained *supra,* at 60–61, a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services. "A governmental body has an obvious interest in making those who specifically benefit from its services pay the cost . . . ." *Massachusetts* v. *United States,* 435 U. S., at 462 (plurality opinion). Though we may accept Sperry's word that it would have preferred to pursue its action against Iran in the familiar and proximate federal district courts, we cannot accept its contention that it did not benefit in any way from the procedures established by the Accords. The fact is that Sperry did benefit directly from the existence and functions of the Tribunal. The Accords that established the Tribunal and the Executive Orders that implemented the Accords assured Sperry that any award made to it, whether as the result of a settlement or otherwise, could be enforced in the courts of any nation and actually paid in this country. Had the President not agreed to the establishment of the Tribunal and the Security Account, Sperry would have had no assurance that it could have pursued its action against Iran to judgment or that a judgment would have been readily collectible. As it was, Sperry filed its claim with the Tribunal, arrived at a settlement with Iran, and had the settlement entered as a formal award by the Tribunal, which was paid in full except for the deduction at issue in this case.

It is not at all dispositive that the award to Sperry was more the result of private negotiations between Sperry and Iran than the Tribunal procedures placed at Sperry's disposal. Sperry filed its claim with the Tribunal and had a formal award entered. Furthermore, Sperry may be required to pay a charge for the availability of the Tribunal even if it never actually used the Tribunal; Sperry received the "benefit from [the Tribunal] in the sense that the services are available for [its] use." *Massachusetts* v. *United States, supra,*

at 468; see also *Clyde Mallory Lines* v. *Alabama ex rel. State Docks Comm'n,* 296 U. S. 261, 266–267 (1935). Had Sperry's negotiations with Iran failed, it would have then had the opportunity to use the hearing rooms, translation facilities, and facilities for service of documents made available through the Tribunal and the State Department. The Tribunal made available to claimants such as Sperry sufficient benefits to justify the imposition of a reasonable user fee.

III

We turn next to Sperry's due process claims. Sperry urges that § 502 violates the Due Process Clause because the deductions apply to awards, such as Sperry's, made by the Tribunal prior to the enactment of the statute. Our standard of review is settled:

> "[R]etroactive legislation does have to meet a burden not faced by legislation that has only future effects. 'It does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.' But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.,* 467 U. S. 717, 730 (1984) (quoting *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1, 16–17 (1976)) (citation omitted).

We agree with the United States that the retroactive application of § 502 is justified by a rational legislative purpose. Retroactive application of § 502 ensures that all successful claimants before the Tribunal are treated alike in that all have to contribute toward the costs of the Tribunal. If Congress had made the application of § 502 prospective only, the costs of the Tribunal would have fallen disproportionately on the claimants whose awards, for whatever reason, were

delayed, and Congress might have had to increase the percentage charge on those claimants to recoup a sufficient portion of the Federal Government's costs. Claimants who were fortunate enough to obtain awards prior to the enactment of the statute would have obtained a windfall by avoiding contribution. It is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them. Cf. *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, *supra*, at 730; *Usery* v. *Turner Elkhorn Mining Co.*, *supra*, at 18.

Nor does § 502 violate the equal protection component of the Due Process Clause[10] because it assesses a user fee only against claimants who have actually received an award from the Tribunal and not against all claimants before the Tribunal. The classification implicitly made by § 502 neither burdens fundamental constitutional rights nor creates suspect classifications, so again our standard of review is that of rationality. See *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 174–175 (1980). Congress could have rationally concluded that only those who are successful before the Tribunal realize a benefit therefrom sufficient to justify assessment of a fee. Congress could also have determined that assessing a user fee against all claimants would undesirably deter those whose claims were small or uncertain of success from presenting them to the Tribunal. This case is wholly unlike *Rinaldi* v. *Yeager*, 384 U. S. 305 (1966), where the Court was unable to discern any legitimate interest that was served by a requirement that the State be reimbursed for the cost of criminal trial transcripts by incarcerated prisoners unsuccessful in their appeals but not by other indigent appellants, even other unsuccessful ones who had not been incarcerated. Here the costs are imposed on only the successful claimants, not, as in *Rinaldi*, only the unsuccessful ones, a situation presenting entirely different considerations.

---

[10] See *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954).

Moreover, as discussed *supra*, at 65, a sensible distinction may be made between successful claimants who have completed the Tribunal proceedings and all other claimants.

## IV

As a final ground for affirming the judgment below, Sperry relies on an argument presented to, but not passed on by, the Court of Appeals, *i. e.*, that § 502 was enacted in violation of the Origination Clause of Article I, § 7, which provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." Sperry refers us to the legislative history of the Foreign Relations Authorization Act, which indicates that § 502 was added as a Senate amendment to a bill that contained no revenue-raising provisions when it originated in the House.

We do not reach the merits of this contention. In another case to be argued this Term, we have directed the parties to brief whether claims based on the Origination Clause present nonjusticiable political questions. See *United States* v. *Munoz-Flores*, cert. granted, *post*, p. 808; cf. *INS* v. *Chadha*, 462 U. S. 919, 940–943 (1983); *Baker* v. *Carr*, 369 U. S. 186, 217 (1962). Although this Court has on prior occasions appeared to address the merits of Origination Clause claims, see, *e. g.*, *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 143 (1911); *Millard* v. *Roberts*, 202 U. S. 429 (1906); *Twin City Bank* v. *Nebeker*, 167 U. S. 196 (1897), it would be inappropriate for us to do so now, before we decide the threshold question of justiciability in *Munoz-Flores*. Furthermore, even assuming that Origination Clause claims are justiciable, we would benefit from the views of the Court of Appeals, which found it unnecessary to address the Origination Clause issue. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*