**Gholam Reza Pasban DOWLATSHAHI, Plaintiff–Appellant,**

**v.**

**MOTOROLA, INC., Defendant–Appellee.**

**No. 90–3841.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 21, 1992.

Decided July 22, 1992.

David F. Schmidt, Robert Saxon Milnikel (argued), Daniel V. O'Leary, Peter J. Strand, Peterson & Ross, Chicago, Ill., for plaintiff-appellant.

Chaim T. Kiffel (argued), Kirkland & Ellis, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

Plaintiff-appellant Gholam Reza Pasban Dowlatshahi is a citizen of Iran residing in Tehran. Defendant-appellee Motorola, Inc. is an international corporation, incorporated in Delaware with its principal place of business in Schaumburg, Illinois. Dowlatshahi appeals the district court's order dismissing his amended complaint against Motorola that sought indemnification and damages for breach of contract. Because we find that Dowlatshahi's allegations state a claim upon which relief may be granted, we reverse and remand.

## I.

■ At the outset, we note that we review the district court's decision to grant Motorola's motion to dismiss *de novo*, assuming the truth of all well-pleaded factual allegations and making all possible inferences for Dowlatshahi. *Wroblewski v. City of Washburn*, 967 F.2d 452, 453 (7th Cir.1992). *See also Prince v. Rescorp Realty*, 940 F.2d 1104, 1106 (7th Cir.1991). Thus, the "facts" of this case consist of the allegations contained in Dowlatshahi's amended complaint. *See* R.Doc. 51, Amended Complaint at 1–7, ¶¶ 1–9.

This case essentially arises from the Iranian Revolution in 1979 which overthrew the Shah's Imperial Government. An imprisoned victim of this violent revolt, Dowlatshahi alleges that Motorola failed to honor its obligations to him under his employment contract. Before the revolution, Motorola conducted business in Iran through Milcom Communications & Electronics, Ltd. ("Milcom"). Milcom was a wholly-owned subsidiary of Motorola Israel, Ltd. ("Motorola Israel"), which in turn is wholly-owned by Motorola. Milcom was a shell corporation that depended on Motorola and Motorola Israel for its operating capital and financial support. Milcom is registered as an alien company in Iran and has no Iranian shareholders or board of directors.

In 1972, Motorola hired Dowlatshahi to work in Iran for Milcom. He was employed in various capacities, eventually becoming the general manager. Dowlatsh-ahi's most recent employment agreement was executed on December 12, 1977. The agreement contained a termination clause requiring a ninety-day prior written notice. Under Milcom's Articles of Association, Dowlatshahi, as general manager, is entitled to be indemnified by Motorola for losses, costs, or expenses sustained by him on account of his position with Milcom.

Because Milcom had no capitalization or retained earnings, Motorola funded immediate expenses. To provide Milcom with operating capital, Motorola arranged a line of credit in Iranian rials up to the equivalent of $300,000 from the Iran–Japan Bank (now Bank Tejaret) (the "Bank"). Because Milcom had no assets to secure that line of credit, the Bank required that Motorola provide guarantees for repayment. At Motorola's direction, the Israeli Discount Bank and Bank Leumi issued bank-to-bank guarantees to the Bank to secure Milcom's line of credit.

Motorola directed Dowlatshahi, as general manager of Milcom, to act as its agent in securing the line of credit. Motorola also directed him to sign for the line of credit as its managing agent, for which he was held personally liable. Whenever the line of credit was drawn to near its limits, Motorola would forward sufficient funds to restore the credit. The line of credit was obtained and used solely for Milcom's business.

In 1978 and 1979, internal unrest in Iran led Motorola to evacuate many of its agents and employees. Dowlatshahi, however, was not so fortunate. Motorola expected its general manager to stay in Iran and remain in charge of Milcom, protecting Motorola's property, facilities, and operations. When the Iranian civil authority was overthrown completely, the Revolutionary Guard seized Milcom and imprisoned Dowlatshahi. He was confined and tortured as a suspected foreign spy because of his managerial position with an alien corporation. After several months, Dowlatshahi was released from prison on August 28, 1979, but still was restricted to house arrest pending trial. During his imprisonment and period of house arrest, he

was forbidden to have any contact with Motorola.

Dowlatshahi eventually was cleared of the charge of spying, but remains "personally hostage," *see* Amended Complaint, p. 9, ¶ 15, for the payment of the line of credit because of his signature guarantee. Apparently Motorola has not made payments on its line of credit and it has blocked payment of the bank-to-bank guarantees, thus exposing Dowlatshahi to civil liability. The Bank has obtained a judgment against Dowlatshahi for the amount owing on the line of credit and has secured a court order prohibiting Dowlatshahi from leaving Iran until the debt is paid. For ten years, he was unable to see his family. In 1989, by mortgaging real estate owned by family and friends, Dowlatshahi was permitted to leave Iran briefly in order to contact Motorola in person.

In his two-count action, Dowlatshahi alleges that Motorola agreed to indemnify him for his obligation to the Bank and that Motorola breached its employment contract by failing to pay his salary from 1980 to the present. Dowlatshahi has requested that Motorola either repay the line of credit or make other arrangements that will exonerate him from liability for what he asserts is Motorola's debt. He also seeks backpay and interest for Motorola's breach of his employment contract.

In orders dated August 29, 1990, 1990 WL 129652, and October 31, 1990, 1990 WL 171623 the district court dismissed both counts of Dowlatshahi's complaint for failure to state a claim upon which relief might have been granted. On the issue of Dowlatshahi's backpay, the district court reasoned that there was no basis on which Dowlatshahi could recover. The court stated:

> Dowlatshahi stopped performing as Milcom's general manager in 1979. At that time, the Iranian government seized Milcom and imprisoned Dowlatshahi. Dowlatshahi could not continue to work for Milcom after Iran seized Milcom's assets and arrested him. Even if Dowlatshahi was a Motorola employee under his veil-piercing theory, he could not continue to work for Motorola while he was in custody. After his arrest, Dowlatshahi no longer functioned as Milcom's general manager, and his employment contract automatically ended. The employment contract does not require Motorola to pay Dowlatshahi for the ten-year period since his imprisonment.

Appellant's Appendix, District Court Order, August 29, 1990 at 12. Finding no factual allegations to support the inference that Motorola renewed the employment relationship after Milcom was seized and Dowlatshahi imprisoned, the district court dismissed Dowlatshahi's backpay claim.

The district court similarly rejected Dowlatshahi's second claim in which the plaintiff seeks "exoneration" from his obligation to pay the Bank the outstanding balance on a line of credit. *See* Amended Complaint, p. 12. The court held that the United States Treasury Regulation, 31 C.F.R. § 535.201 (1989) ("§ 535.201") prohibits Motorola from transferring funds, either directly to the Bank, or to Dowlatshahi in the form of indemnification payments. Finding that his claim did not fall within any exception to the § 535.201, the district court barred Dowlatshahi's claim for exoneration and dismissed his complaint with prejudice. Dowlatshahi appealed.

## II.

■ On appeal, Dowlatshahi argues that the district court erred in dismissing his complaint. He first offers several reasons why the treasury regulations, specifically § 535.201, do not bar his claim for exoneration. Although we agree that § 535.201 does not preclude the claim, we do not necessarily endorse all the reasons Dowlatshahi discusses in his brief.

The task of interpreting the treasury regulations that arose in response to the Iran/United States tensions of the late 1970s and early 1980s is not without direction. In *United States v. Sperry*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989), the Supreme Court reviewed the history and meaning of the Iran-related regulations. As we all surely remember, on November 4, 1979, the United States

Embassy in Tehran was seized by revolutionary forces. Ten days later, President Carter issued Executive Order No. 12170, blocking the removal or transfer of all property of the Government of Iran subject to American jurisdiction. *See id.* at 55, 110 S.Ct. at 391 (citing 3 CFR 457 (1980)). The following day, the Secretary of the Treasury promulgated regulations to enforce the prohibitions of the President's order. The primary prohibitionary section issued is § 201, which outlaws the transfer of any property in which Iran has an interest. *Id.* § 535.201, the regulation critical to this case, reads:

> No property subject to the jurisdiction of the United States or which is in the possession of or control of persons subject to the jurisdiction of the United States in which on or after the effective date Iran has any interest of any nature whatsoever may be transferred, paid, exported, withdrawn or otherwise dealt in except as authorized.

31 CFR § 535.201 (1980). This regulation is in effect today. *See* 31 CFR § 535.201 (1991).

On January 19, 1981, the United States and Iran reached an agreement for the release of the hostages and for the disposition of claims arising out of the revolution. This agreement, commonly referred to as the Algiers Accords, provided for the establishment in The Hague of an international arbitral tribunal, known as the Iran–United States Claims Tribunal (the "Tribunal"), to hear claims brought by Americans against the Government of Iran. *Sperry*, 493 U.S. at 55, 110 S.Ct. at 391. As the *Sperry* court declared, "The establishment of the Tribunal was to preclude litigation by Americans against Iran in American courts, so the United States undertook to terminate such legal proceedings, unblock Iranian assets in the United States, and nullify all attachments against those assets." *Id.* at 55–56, 110 S.Ct. at 391. The accords made clear the purpose of the Tribunal: "It is the purpose of the United States and Iran ... to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration." *Dames & Moore v. Regan*, 453 U.S. 654, 665–66, 101 S.Ct. 2972, 2979, 69 L.Ed.2d 918 (1981) (quoting accords).

The language and history of these regulations—particularly the establishment of the Tribunal—suggest that § 535.201 is not a complete bar to Dowlatshahi's claim for exoneration. We reach this conclusion first by recognizing that the plaintiff has alleged sufficient facts that may give rise to a duty. As the district court properly determined, Dowlatshahi may be able to prove facts at trial that would entitle him to pierce Milcom's corporate veil and hold Motorola responsible both for satisfaction of the line of credit and backpay from 1980 to the present. *See* Appellant's Appendix at 4–6. Thus, accepting Dowlatshahi's allegations as true for purposes of this appeal, we have no trouble agreeing that Motorola may owe a duty to its Iranian manager.

Having appropriately alleged Motorola's duty, the only hurdle that Dowlatshahi must overcome in order to withstand a motion to dismiss is § 535.201 of the treasury regulations. Even if we accept the district court's reasoning that Dowlatshahi stands in the shoes of an Iranian entity, namely Bank Tejaret, the broad language of the Algiers Accords seem designed to ensure that claims between Iranian and American entities be resolved through arbitration. Even Motorola agrees that the Tribunal at The Hague is the appropriate forum in which to resolve this dispute. *See* Appellee's Brief at 31.

The problem in this case is that, based on Dowlatshahi's allegations, the Iranian courts have not played by rules. In ¶ 15 of his amended complaint, Dowlatshahi alleges that the Bank obtained a judgment (presumably in an Iranian court) against him for repayment of the line of credit. If we accept as true Dowlatshahi's assertion that he obtained the line of credit only as agent for Motorola, *see* Amended Complaint at ¶ 10, then the judgment against Dowlatshahi obtained in the Iranian courts should have been suspended once the Algiers Accords were ratified. The Bank then could have taken its claim for repayment of the

line of credit to The Hague for resolution. This is exactly what has occurred with American judgments against Iranian entities prior to acceptance of the accords.

In *Sperry,* for instance, the Sperry Corporation filed suit against Iran prior to the accords in the United States District Court for the District of Columbia and obtained a prejudgment attachment of blocked Iranian assets. Executive orders after the Iranian–American rapprochement in 1981 (which were sustained in *Dames & Moore v. Regan,* 453 U.S. at 654, 101 S.Ct. at 2972), however, invalidated Sperry's attachment and prohibited Sperry from further pursuing its claims against Iran in any American courts. *See Sperry,* 493 U.S. at 56, 110 S.Ct. at 391. Sperry therefore filed its claim against Iran with the Tribunal at The Hague and the parties eventually reached a settlement. *Id.*

But in the instant case, the pre-accords judgment against Dowlatshahi has not been invalidated or suspended. If we determine that the treasury regulations bar his suit in the district court, then Dowlatshahi is left with no recourse. It is easy to see that the accords are meaningless if only one party abides by their dictates. Here, Dowlatshahi is burdened with an Iranian judgment that he claims is Motorola's responsibility to satisfy. Motorola does not argue that the repayment of Bank Tejaret's credit is not its (or Milcom's) responsibility. Instead, Motorola insists that § 535.201 bars the suit. If we had the appropriate jurisdiction, we might be inclined to invalidate the Iranian judgment against Dowlatshahi and send all three parties, Motorola, Dowlatshahi, and the Bank, to The Hague for resolution pursuant to the accords. But, unfortunately, our appointments by the President (with the advice and consent of the Senate) do not permit us to review the judgments of Iranian courts. They do permit, however, our determination that the treasury regulations, given the circumstances of this case, pose no legal bar to the plaintiff's claim for exoneration.

In its brief, Motorola recognizes that Iran prosecuted the Bank's claim against Dowlatshahi "in violation of international and American law." *See* Appellee's Brief at 22. But the only remedy Motorola suggests is dismissal of the claim. Motorola points out that it has advanced claim in the Tribunal at The Hague for Iran's seizure of Milcom. Citing Article II of the Iran–United States Treaty, Motorola argues that the debt upon which Dowlatshahi now sues "is a matter Iran could and should have brought against Motorola in its lawsuit before the Tribunal." *See id.* at 32. Motorola stresses that § 535.201 bars Dowlatshahi's suit and cites another regulation, § 535.222, which provides that all claims eligible for adjudication at the Iran–U.S. Claims Tribunal be resolved at that forum. With this reasoning, Motorola concludes that the district court properly dismissed Dowlatshahi's suit.

Although we agree with most of Motorola's reasoning, we do not subscribe to its conclusion. Motorola is quite correct to suggest that Iran should have submitted the Bank's claim for repayment of the line of credit when it originally appeared in the Tribunal at The Hague. But recognizing that Iran and the Bank failed to abide by their procedural obligations does nothing to resolve Dowlatshahi's dilemma. If Dowlatshahi's allegations are true, namely, that he in fact acted merely as Motorola's agent in obtaining the line of credit, then dismissing the exoneration claim only permits Motorola to capture a windfall from the Iranian crisis of 1979.

In other areas of the law, on occasion we have recognized that, in matters of fundamental justice, reality, not mere ritual, must control. *See, e.g., McCarthy v. United States,* 394 U.S. 459, 467 n. 20, 89 S.Ct. 1166, 1171 n. 20, 22 L.Ed.2d 418 (1969) ("The nature of the inquiry required by [Fed.R.Crim.P.] 11 must necessarily vary from case to case.... In all such inquiries, matters of reality, and not mere ritual, should be controlling." (quotations omitted)); *Coogan v. McCaughtry,* 958 F.2d 793, 801 (7th Cir.1992) ("As a general rule, newly discovered evidence that bears only on the question of guilt or innocence is not reviewable.... However, in some situations newly discovered evidence is so com-

pelling that it would be a violation of the fundamental fairness ... not to afford a defendant a new trial."). Through the often nebulous efforts of two nations to resolve their differences if not amicably, then at least peacefully, we perceive that Dowlatshahi should be permitted to have his exoneration claim tried and examined in a court of law. We stress that our holding offers no opinion on the truth or falsehood of the appellant's allegations. Motorola of course shall have at its disposal every defense it can muster to put Dowlatshahi to his proof. We merely allow Dowlatshahi his day in court. Given the unusual circumstances of this case, we hold that § 535.201 does not preclude his claim.

■ We also conclude that Dowlatshahi sufficiently alleged a claim for backpay. Citing § 261 of the Restatement (Second) of Contracts, the district court held that Dowlatshahi's contract terminated in 1979 when performance of the contract became objectively impracticable. *See* Appellant's Brief at 9. We disagree. Section 261 of the Restatement reads:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

*See* Restatement (Second) of Contracts, § 261. *See also Northern Indiana Public Service Co. v. Carbon County Coal*, 799 F.2d 265, 277 (7th Cir.1986); *Waldinger Corp. v. CRS Group Engineers*, 775 F.2d 781, 786–87 (7th Cir.1985); *Freedman v. Air Line Stewards & Stewardesses Assoc.*, 730 F.2d 509, 513 n. 8 (7th Cir.1984). We hold that Dowlatshahi sufficiently alleged that an employment relationship between Motorola and himself existed *after* the Iranian seizure of Milcom. Thus, while the Iranian seizure of Milcom might at first suggest that Dowlatshahi's continuing service as General Manager of Milcom was impracticable, he adequately alleges that the circumstances following the revolution indicate the contrary.

Dowlatshahi alleges that, after executing his latest employment contract with Motorola in 1978, he has continued to serve on Motorola's behalf even after his seizure by the Iranian revolutionaries. *See* Amended Complaint ¶¶ 41–46. Specifically, Dowlatshahi contends that he represented Motorola in negotiations in an ongoing effort to resolve Motorola's debt to Bank Tejaret arising from the line of credit. This allegation logically follows Dowlatshahi's earlier contentions that satisfaction for the line of credit is Motorola's responsibility. If (as we already have determined) Dowlatshahi adequately has alleged that the line of credit is Motorola's debt, it follows that Dowlatshahi's efforts to settle the debt for Motorola suggest that Dowlatshahi continued to act as a manager for Motorola even after Milcom was seized.

Moreover, Dowlatshahi alleges that Motorola acted as if he were still employed. Motorola advanced him the sum of $40,000 to be credited as a salary payment, provided support payments to his former wife and their children, and offered him various managerial positions outside of Iran. Finally, Dowlatshahi alleges that Motorola never terminated his employment contract with the required ninety-day prior written notice. *See* Amended Complaint ¶¶ 43–44. *See also* Employment Contract, R.Doc. 1, Exhibit 1, Article V.

We reiterate that we offer no opinion regarding the veracity of the plaintiff's assertions. Whether Motorola did in fact maintain an employment relationship with Dowlatshahi after his release from prison is a question for the fact-finder. Our task is simply to determine if Dowlatshahi's allegations adequately state a claim which, if proven, may justify relief. We hold that Dowlatshahi's amended complaint contains the necessary allegations.

### III.

For the foregoing reasons, we REVERSE and REMAND the district court's decision that granted Motorola's motion to dismiss Dowlatshahi's complaint. We note that, on

remand, there are several ways Motorola could avoid the relevant treasury regulation. For example, § 535.576 seems to permit Motorola to release the Israeli letters of credit; § 535.568 does the same, while § 535.801 indicates that Motorola can ask the Treasury Department for discretionary relief. We leave it to the discretion of the district court to determine the most reasonable avenue for relief.