SMITH CHAPEL BAPTIST CHURCH; FELLOWSHIP BAPTIST CHURCH, INC.; LAYMAN'S CHAPEL BAPTIST CHURCH; AND CALVARY BAPTIST CHURCH OF DURHAM, NORTH CAROLINA v. CITY OF DURHAM, A NORTH CAROLINA MUNICIPAL CORPORATION

No. 250PA97

(Filed 30 July 1998)

1. **Municipal Corporations § 258 (NCI4th)— stormwater program—landowner fees—no statutory authority**

    N.C.G.S. §§ 160A-311 and -314 do not authorize a city to finance its entire stormwater program with fees assessed against landowners.

2. **Municipal Corporations § 258 (NCI4th)— stormwater program—landowner fees—constitutional authority**

    Article XIV, Section 5 of the North Carolina Constitution authorizes cities to regulate waters, and cities have the supplementary power reasonably necessary to do so. It was reasonably necessary for a city to assess fees against landowners to finance the city's stormwater program to comply with the federal Water Quality Act, and the city could base the amount of fees on the amount landowners contributed to the stormwater problem measured by the impervious area of each developed lot. N.C. Const. art. XIV, § 5, para. 1.

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[348 N.C. 632 (1998)]

**3. Municipal Corporations § 258 (NCI4th)— stormwater program—landowner fees—consideration of statutes**

Although a city was given the authority outside the parameters of N.C.G.S. § 160A-311 and -314 to impose fees to support its stormwater program, the appellate court will be guided by those two statutes in questions of the administration of the program.

**4. Municipal Corporations § 258 (NCI4th)— stormwater program—landowner fees—impervious area method—statutory authority**

A city was authorized by N.C.G.S. § 160A-314(a1) to use the impervious area method in setting stormwater program fees, and the fees were not unlawful on grounds that there was no showing of benefit to landowners, or that this method of calculating fees does not reasonably relate to the stormwater runoff of individual properties.

**5. Municipal Corporations § 258 (NCI4th)— stormwater program—landowner fees not discriminatory**

Fees set by a city to finance its stormwater program in order to receive an NPDES permit were not discriminatory because the city cleans the city's streets but does not clean paved parking lots and private roads of landowners since there is a distinction between city owned property and privately owned property that supports this different treatment. Nor are the rates discriminatory because the city is not required to pay an amount that covers the cost of cleaning its own streets since the fees are set under the impervious area method based on the amount of pollution caused by each lot rather than on how much it costs to clean each lot.

**6. Municipal Corporations § 258 (NCI4th)— stormwater program—landowner fees—exemptions—not equal protection violation**

A city's stormwater plan is not arbitrary and does not deprive owners of developed property of equal protection because the plan exempts undeveloped land, commercial property with less than 1200 square feet of impervious area, golf courses, state roads, and railroad corridors and tracks, or because the maximum charge for residential property is $3.25 per month, since each of the exemptions was justified, and there was no showing that the fees collected from residential property were substantially less because of the $3.25 limit.

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[348 N.C. 632 (1998)]

Justice FRYE concurs in the result.

Justice LAKE dissenting.

Justice ORR joins in this dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of a judgment entered by Manning, J., on 11 October 1996 and an amended judgment entered on 3 January 1997 in Superior Court, Durham County. Heard in the Supreme Court 19 November 1997.

In this case, the plaintiffs contest a program established by the City of Durham to comply with the Water Quality Act (WQA) adopted by the United States Congress. The WQA required that cities of 100,000 or more in population obtain a National Pollutant Discharge Elimination System (NPDES) permit to discharge stormwater into the waters of the state. Stormwater is that portion of rain that does not evaporate or penetrate the ground but remains on the surface and travels over natural and developed surfaces. In order to receive a NPDES permit, a city must develop a comprehensive stormwater quality program.

To comply with the federal requirements, the City of Durham adopted an ordinance creating a city department called the Stormwater Services Division to operate the stormwater program. The program was to be financed by charging fees for all developed land in the City. Fees were based on the impervious areas of the assessed land. The Durham Stormwater Utility (Utility) was created to receive the fees and to pay the expenses of the Stormwater Services Division.

The plaintiffs brought this action for a declaratory judgment alleging that the City of Durham did not have the authority to impose fees to operate its stormwater program. After a trial without a jury, the superior court held that the City did not have the statutory authority to use fees to fund more than the cost of a stormwater and drainage system and that it had exceeded its authority by imposing fees to fund other parts of its stormwater program.

The defendant appealed, and we allowed discretionary review prior to determination by the Court of Appeals.

**SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM**

[348 N.C. 632 (1998)]

*Stam, Fordham & Danchi, P.A., by Paul Stam, Jr., and Henry C. Fordham, Jr., for plaintiff-appellees.*

*Office of the City Attorney, by Karen A. Sindelar, Assistant City Attorney, for defendant-appellant.*

*North Carolina League of Municipalities, by Andrew L. Romanet, Jr., General Counsel, amicus curiae.*

WEBB, Justice.

[1] The defendant contends that two sections of the General Statutes give the City of Durham the authority to assess fees to operate its stormwater program, although a large part of the program expenditures do not involve the physical assets of the program.

N.C.G.S. § 160A-311 provides in part:

As used in this Article, the term "public enterprise" includes:

. . . .

(10) Structural and natural stormwater and drainage systems of all types.

N.C.G.S. § 160A-311 (1994).

N.C.G.S. § 160A-314(a1) provides in part:

The fees established under this subsection must be made applicable throughout the area of the city. Schedules of rates, fees, charges, and penalties for providing structural and natural stormwater and drainage system service may vary according to whether the property served is residential, commercial, or industrial property, the property's use, the size of the property, the area of impervious surfaces on the property, the quantity and quality of the runoff from the property, the characteristics of the watershed into which stormwater from the property drains, and other factors that affect the stormwater drainage system. Rates, fees, and charges imposed under this subsection may not exceed the city's cost of providing a stormwater and drainage system.

N.C.G.S. § 160A-314(a1), para. 2 (1994). The defendant argues that the adoption of these two sections was in response to the requirements of the WQA, which shows that the fees for which N.C.G.S. § 160A-314(a1) provides were intended to finance its entire stormwater program. The plaintiffs contend that the City is limited to collect-

ing fees which will finance only the structural and natural stormwater and drainage systems component part of the stormwater program. We agree with the plaintiffs that the statutes alone do not authorize the ordinance.

When the language of a statute is clear, there is no need for judicial interpretation. We give the statute its plain meaning. *State v. Dellinger*, 343 N.C. 93, 95, 468 S.E.2d 218, 220 (1996). In this case, the words "structural and natural stormwater and drainage system" have a plain meaning. In the ordinance establishing the stormwater program, a stormwater system is defined as "the system of natural and constructed devices for collecting and transporting storm water." Durham, N.C., Code ch. 23, art. VIII, § 23-201 (1994). We can only hold N.C.G.S. §§ 160A-311 and -314 do not authorize the City to finance its entire stormwater program with fees assessed against landowners.

[2] We must next determine whether the City has the authority from any other source to impose fees to finance the stormwater program. We believe that it has such authority. Article XIV, Section 5 of the Constitution of North Carolina provides in part:

It shall be the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry, and to this end it shall be a proper function of the State of North Carolina and its political subdivisions to . . . control and limit the pollution of our air and water . . . and in every other appropriate way to preserve as a part of the common heritage of this State its forests, wetlands, estuaries, beaches, historical sites, openlands, and places of beauty.

N.C. Const. art. XIV, § 5, para. 1.

We believe this section of the Constitution gives our cities the authority to regulate our waters. If the City has this power, we believe we should follow the rule of *Homebuilders Ass'n of Charlotte v. City of Charlotte*, 336 N.C. 37, 45, 442 S.E.2d 45, 50-51 (1994), that when a city has the power to regulate activities, it has a supplementary power reasonably necessary to carry the program into effect. *See* N.C.G.S. § 160A-4 (1987).

In this case, it was reasonably necessary for the City of Durham to assess fees against landowners to finance the stormwater program to comply with the WQA. The City could base the amount of fees on the amount landowners contributed to the stormwater problem. In

this case, the contribution to the problem is measured by the impervious area of each lot.

[3] Although we have held that the City has the authority outside the parameters of N.C.G.S. §§ 160A-311 and -314 to impose fees to support the program, we shall be guided by those two sections in questions of the administration of the program.

[4] The plaintiffs contend that the method by which fees are calculated for use of the stormwater system is unlawful. The fees are based on the impervious areas of each lot. An impervious area is that part of a lot in which surface water cannot penetrate the soil, and each lot is assessed based on the size of the impervious area.

The plaintiffs argue that a fee for utility service must be commensurate with the services rendered, and the evidence showed there was virtually no benefit to them. In this case, the fees are not based on service to the landowners. N.C.G.S. § 160A-314(a1) provides several methods for setting fees. One method is based on "the area of impervious surfaces on the property." The statute does not require that there be a showing of benefit to the landowners, and the plaintiffs have not questioned the constitutionality of the statute.

The plaintiffs next contend that the impervious-area method of calculating fees does not reasonably relate to the stormwater runoff of individual properties. They argue that several other methods better measure the quantity and quality of the runoff and that it was unreasonable for the City to use this method. The best answer to this argument is that the City is authorized by statute to use the impervious-area method in setting runoff fees. There is substantial evidence in the record that consultants hired by the City considered several different methods before recommending the impervious-area method. There was plenary evidence that the impervious-area method for calculating fees is the best method. This supports the selection of the impervious-area method for setting fees.

[5] The plaintiffs next argue that the rates set by the City are discriminatory. They base this argument on the way the cost of street cleaning is handled under the plan. The City was required, as part of its plan to receive an NPDES permit, to clean its streets. The costs to the Utility to clean the streets was $1,820,087, but the fee charged to the City was only $1,280,000. The plaintiffs say first that it is discriminatory for the Utility to clean the City's streets but refuse to clean the paved parking lots and private roads of its customers. The plaintiffs

say next that it is discriminatory to charge the City an amount which does not cover the cost of the City's pollution.

The City has produced a plan as it was required to do to receive its NPDES permit. The plan does not provide that the City clean private property. There is a distinction between city owned property and privately owned property that supports this different treatment.

The argument that it is discriminatory not to require the City to pay an amount that covers the costs of removing its own pollution is answered by an understanding of the impervious-area method of calculating fees. These fees are set based on the amount of pollution caused by each lot, not on how much it costs to clean each lot. We have no doubt pollution in the streets is caused in part by drainage from the surrounding land.

The plaintiffs next contend that the Stormwater Quality Management Program contains many features which serve to benefit the public but are of no particular benefit to the persons who are assessed to pay for it. They say this makes the program arbitrary and capricious. We disagree. It is not arbitrary and capricious to promulgate a plan for the amelioration of a stormwater problem and require those who caused the problem to pay for it. There is no need to show a particular benefit to a landowner. It is the public which benefits from this program.

The plaintiffs next argue that the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States has been violated because the City of Durham's stormwater charges are not reasonably related to services provided. We have held that fees based on the amount of impervious area are valid and reasonable. On that basis, we reject this argument.

[6] Finally, the plaintiffs argue that the City's stormwater plan violates the Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 19 of the Constitution of North Carolina. They say this is so because of certain exemptions from the plan. There are 45,304 acres in the City of Durham, of which 23,720 acres are in undeveloped land. These undeveloped acres are exempt from the plan. Commercial property with less than 1,200 square feet of impervious area is also exempt, as are golf courses, state roads, and railroad corridors and tracks. Furthermore, the maximum charge for residential property is $3.25 per month.

SMITH CHAPEL BAPTIST CHURCH v. CITY OF DURHAM

[348 N.C. 632 (1998)]

The plaintiffs contend that these exemptions are arbitrary and deprive them of the equal protection of the law. We believe each of the exemptions can be justified. First, undeveloped land and golf courses do not produce as much runoff as do impervious areas. Second, commercial property with 1,200 square feet of impervious area produces a *de minimus* amount of stormwater runoff. Third, it would be difficult for a city to assess the State for land owned by the State as state roads. Next, railroad corridors and tracks have very little impervious area, and thus it is not unreasonable to exempt them from the program. Finally, residential property is distinguishable from nonresidential property. There was not a showing in this case that the fees collected from residential property were substantially less because of the $3.25 limit.

For the reasons stated in this opinion, we reverse the decision of the Superior Court, Durham County, and remand for the entry of a judgment for the defendant.

REVERSED AND REMANDED.

Justice FRYE concurs in the result.

Justice LAKE dissenting.

I must respectfully dissent because the statutes governing the operation of public enterprises for municipal corporations clearly invalidate the enabling ordinance at issue in this case, as well as the actions taken by the "utility" established thereunder.

It is undisputed that, for reasons of expediency, the City of Durham *chose* to establish a utility as the mechanism by which it would comply with the unfunded mandates of the 1987 Water Quality Act related to stormwater runoff. Municipalities are authorized to establish and to operate public enterprises like utilities only as provided by statute. Having chosen this method, therefore, the City must abide by the statutory requirements of N.C.G.S. § 160A-311 and N.C.G.S. § 160A-314, which govern such public enterprises. These statutes read in relevant part:

§ 160A-311. Public enterprise defined.

As used in this Article, the term "public enterprise" includes:

. . . .

> (10) *Structural and natural* stormwater and drainage *systems* of all types.

N.C.G.S. § 160A-311 (1994) (emphasis added).

> § 160A-314. Authority to fix and enforce rates.
>
> (a) A city may establish and revise from time to time sched-ules of rents, rates, fees, charges, and penalties for the use of or the services furnished by any public enterprise. Schedules of rents, rates, fees, charges, and penalties may vary according to classes of service, and different schedules may be adopted for services provided outside the corporate limits of the city.
>
> (a1) . . . .
>
> The fees established under this subsection must be made applicable throughout the area of the city. Schedules of rates, fees, charges, and penalties for providing *structural and natural* stormwater and drainage system service may vary according to whether the *property served* is residential, commercial, or indus-trial property, the property's use, the size of the property, the area of impervious surfaces on the property, the quantity and quality of the runoff from the property, the characteristics of the water-shed into which stormwater from the property drains, and other factors that affect the stormwater drainage system. Rates, fees, and charges imposed under this subsection *may not exceed the city's cost* of providing a stormwater and drainage system.

N.C.G.S. § 160A-314(a), (a1) (Supp. 1997) (emphasis added).

In deciding whether the City's public enterprise complies with the above statutes, we first must look to the plain language of the statutes themselves. *State v. Dellinger*, 343 N.C. 93, 95, 468 S.E.2d 218, 220 (1996). "Ordinary rules of grammar apply when ascertaining the meaning of a statute." *Dunn v. Pacific Employers Ins. Co.*, 332 N.C. 129, 134, 418 S.E.2d 645, 648 (1992). When the language of a statute is clear, there is no need for judicial interpretation, and the court should give the statute its plain meaning. *Dellinger*, 343 N.C. at 95, 468 S.E.2d at 220.

In the case *sub judice*, the language of the above statutes is clear. N.C.G.S. § 160A-311 defines "public enterprises" as "structural and natural stormwater and drainage systems." The word "systems" is limited by the adjectival phrases "structural and natural" and "stormwater and drainage." Thus, the plain meaning is that the public

enterprises authorized by the statute applicable here are expressly limited to those which oversee systems of physical infrastructure, structural or natural, for servicing stormwater. N.C.G.S. § 160A-314 reinforces this understanding of the statutory construct. That statute provides that the City may establish fees "for the *use of* or the *services furnished*" and that fees may vary for "structural and natural stormwater and drainage system service" according to the type and size of "property served." N.C.G.S. § 160A-314(a), (a1) (emphasis added). This plain language contemplates only the collection of fees for the "use of" or "furnishing of" stormwater services by the utility. The statute further modifies the setting of fees by tying their computation to the particular "property served." Thus, the plain meaning of these statutes is that, in order to operate as an authorized public enterprise for the purposes of stormwater control, the utility in question is limited to the establishment and maintenance of physical systems directly related to stormwater removal and drainage of property.

Even though the plain language of the statute is sufficient to determine its meaning in this case, it is also clear the legislature intended for public enterprises of this type to operate actual drainage systems, not broad pollution protection programs. In ascertaining the intent of the legislature, the title of an act should be considered as a guide. *State ex rel. Cobey v. Simpson*, 333 N.C. 81, 90, 423 S.E.2d 759, 764 (1992). The act that added the statutory provisions regarding stormwater was titled:

AN ACT TO AUTHORIZE LOCAL GOVERNMENTS TO CONSTRUCT AND OPERATE STORM DRAINAGE SYSTEMS AS PUBLIC ENTERPRISES AND TO PROVIDE LOCAL GOVERNMENTS WITH FUNDING AND TAXING AUTHORITY TO FINANCE THE CONSTRUCTION AND OPERATION OF STORM DRAINAGE SYSTEMS.

Act of July 15, 1989, ch. 643, 1989 N.C. Sess. Laws 1763. The title's focus on "construction and operation" of storm drainage "systems" indicates the legislature did not intend for such public enterprises to be used as general programmatic bodies, but rather as organizations charged merely with the supervision of physical drainage systems.

When determining the intent of the legislature, it is also significant if the General Assembly adopts provisions which differ from those suggested by a study commission. *Black v. Littlejohn*, 312 N.C. 626, 634, 325 S.E.2d 469, 475-76 (1985). The study commission proposal did not contain language that tied stormwater charges to services provided to properties. Proposed Legislation: Study Commission

Report to 1991 N.C. General Assembly 44-45. Conversely, the adopted statute linked the charges for stormwater services to the character of property served. This is indicative of the legislature's intent that stormwater utilities limit their activities to physical systems for the removal of stormwater from property.

Examination of the City's ordinance establishing the utility, as well as the actual operation of the utility, reveals the City to have exceeded the authority conferred upon it by the plain language of the statutes. The ordinance creates a stormwater utility "to develop and operate the stormwater management program." The "program" is defined by the ordinance to include not just a stormwater system, but also "the development of ordinances, policies, technical materials, inspections, monitoring, outreach, and other activities related to the control of stormwater quantity and quality." Durham, N.C., Code ch. 23, art. VIII, § 23-201 (1994). Similarly, the ordinance provides that "all developed land . . . shall be subject to a stormwater charge," *id.*, not just property served by the system. Thus, the ordinance on its face exceeds the express limitations in the plain meaning of the statute. Moreover, the operation of the utility exceeds statutory authority. All funds collected by the utility are placed in one fund, and this fund pays for the City's entire stormwater quality program. The City concedes the utility's activities substantially exceed the providing of stormwater infrastructure. Over half of the funds go to general programmatic elements involving water quality, such as general education programs for commercial and residential areas, programs related to discharge and disposal of hazardous materials, inspection and training for industrial sites, and construction-site runoff consultation. It is clear the ordinance and its application through the utility exceed the express limitations imposed by the plain language of N.C.G.S. §§ 160A-311 and -314.

Moreover, N.C.G.S. § 160A-314 expressly mandates that "[r]ates, fees, and charges imposed under this subsection *may not exceed the city's cost* of providing a stormwater and drainage system." N.C.G.S. § 160A-314(a1) (emphasis added). The uncontroverted evidence establishes the City spent only a fraction of the money collected by the utility on the cost of constructing the stormwater and drainage infrastructure. The vast majority of the fees were spent on general programmatic pollution reduction efforts. This exceeds the authority conferred by the plain meaning of the statutes. Even assuming *arguendo* that the majority's expansive interpretation is correct, the evidence still shows the utility to have exceeded its authority. The

City admits substantial sums of money collected for the purposes of operating the stormwater "utility" were transferred to other city uses, including the sewer and landfill funds, and even the general fund. The evidence establishes the City transferred over $1.8 million to the general fund alone. Leaving aside the question of whether this amounts to an illegal or unconstitutional taxation of these churches *via* the utility strawman, which is not raised on appeal, it clearly exceeds any reasonable interpretation of N.C.G.S. § 160A-314, which requires that fees not exceed costs.

Additionally, the defendant's unreasoned, blanket exclusion of all undeveloped land (which is approximately 50% of the area producing the stormwater the ordinance purports to address), defendant's like exemption of certain types of commercially developed properties, and its diversion of very substantial portions of the funds generated from the assessed "user fees" to programs unrelated either to cost of service in providing stormwater infrastructure or any benefit received or burden generated by the plaintiff churches, if not violative of equal protection, seem clearly to be "so arbitrary and unreasonable as to amount to a deprivation of the plaintiff[s'] liberty or property, in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States or the similar Law of the Land Clause of Art. I, § 19, of the Constitution of North Carolina." *Guthrie v. Taylor*, 279 N.C. 703, 713, 185 S.E.2d 193, 200 (1971). *See also United States v. Sperry Corporation*, 493 U.S. 52, 63, 107 L. Ed. 2d 290, 303 (1989).

In light of the fact that the ordinance at issue, as well as its application, exceeds the express limitations established by the plain meaning of N.C.G.S. §§ 160A-311 and -314 and is, I believe, violative of equal protection and due process, I vote to uphold the determination of the trial court.

Justice ORR joins in this dissenting opinion.