PER CURIAM.
 

 The St. Clair County Home Builders Association; Buck, Inc.; and QCC, Inc. (hereinafter collectively referred to as “the home builders”), appeal the trial court’s judgment against them in a declaratory-judgment action the home builders brought against the City of Pell City (“the City”); the City Council of the City of Pell City (“the city council”); Gregg Gossett, J.T. Carter, Ed Pennington, Donnie Todd, Jr., and Gaston Williams in their representative capacities as members of the city council; Earl Sims, in his capacity as the utility supervisor of the City; and Adam Stocks, in his capacity as the mayor of the City (“the mayor”) (hereinafter collectively referred to as “the defendants”), challenging the validity of Ordinance No. 2007-1925, adopted by the City on April 19, 2007, styled “An Ordinance Establishing Impact Fees for Sewer Service and Capital Recovery Fees for Water Service” (“the ordinance”). We affirm.
 

 Facts and Procedural History
 

 The City, a municipal corporation organized and existing under the laws of Alabama, owns its water and sewer systems, through which it provides water and sewer services to its customers. In 1999, the City employed Municipal Consultants, Inc., an engineering consultant, to evaluate the City’s water and sewer systems. According to the affidavit of Byron Woods, a professional engineer employed by Municipal Consultants who has personally worked with the City since 2000, Municipal Consultants recommended that the City perform studies on the City’s water and sewer systems to determine the efficiencies of the existing systems, as well as any recommended improvements that were then needed or that would be needed in the future. Woods further testified:
 

 “In 2000, we prepared The City of Pell City Water Study and Capital Improvements Plan (‘2000 Water Study1).... In order to prepare the 2000 Water Study, we mapped the City’s existing water system and determined pipe locations and pipe sizes. We also looked for weaknesses in the existing system, and areas that required improvements. We also looked at the current water demand of the City, and projected future water demand through the year 2020. As can be seen on page 4-6 of the 2000 Water Study, in 2000 the City’s peak day demand was 3.617 million gallons per day, and the supply was 4.262 million gallons per day. Basing our projections on increases in water
 
 *996
 
 demands over the past several years in the City, we projected that by the year 2020 the City’s peak day demand would be 6.965 million gallons per day, which we calculated would require 9.287 million gallons per day of pumping capacity. Based on our calculations, in order to be able to accommodate the projected demand by the year 2020, the City would need 5.025 million gallons per day in additional water supply. We recommended several projects that would be necessary to meet this future demand, and calculated the cost of these improvements in 2000 at $9,027,200.”
 

 Woods also testified that Municipal Consultants conducted another study on the City’s sewer system in 2003:
 

 “In 2003, we prepared The City of Pell City Sewer System Study (‘2003 Sewer Study’).... Like the 2000 Water Study, we began by mapping the system and determining what capacity and facilities the City had currently. The City also hired DWC Technologies to perform a sewer system flow monitoring to determine the average and peak flows through the City’s sewer system. Using the data from our mapping and the flow monitoring, we prepared the 2003 Sewer Study detailing the efficiencies of the existing system, and recommended improvements to the system that would both increase the efficiency of the existing system and provide additional capacity for future growth in the City.
 

 “... The sewer system was and is in need of substantial repairs to better serve existing customers which should create additional capacity for new customers. The 2003 Sewer Study also contained several alternatives for improving both the collection system and the wastewater treatment plant. However, in determining what improvements were required, the City and Municipal Consultants decided to upgrade the system in a manner that would increase capacity to allow for future growth in the City. The City chose Collection System Alternative 2 and Treatment Alternate A, with a collective cost in 2003 of $23.3 million. (Exh. ‘1,’ p. V-l). This cost included both repairs to the existing system as well as expansion and upgrades to provide additional capacity for future growth.”
 

 In July 2004, the former mayor of the City, Guin Robinson, acting in his official capacity as mayor, formed an infrastructure committee (“the committee”) to “review the present and future needs of water and sewer” for the City and to “review the present water and sewer system and advise the elected officials of the [C]ity on how the [C]ity may provide infrastructure for current and anticipated growth.” The committee was reauthorized by the mayor when he took office in 2004. The committee met on nine occasions over the course of five months, and subcommittees conducted several meetings with various professionals. Municipal Consultants provided the committee with the 2000 Water Study and the 2003 Sewer Study and also met with the committee on numerous occasions to answer any engineering questions relating to the City’s water and sewer systems.
 

 In late 2004, the committee presented its final report to the mayor detailing its conclusions on improvements needed in the City’s water and sewer systems, as well as recommendations on how to fund those improvements. The committee found, in pertinent part:
 

 “It is well documented that a major upgrade to the sewer system is essential if the City of Pell City is going to be able to serve the growth that is sure to be available. The upgrade will be in the
 
 *997
 
 form of improvements to certain lift stations, increased capacity to the Dye Creek Wastewater Treatment Plant, and/or the construction for an additional waste water treatment plant in the Eden vicinity, completion of a northern interceptor, the addition of additional lift stations and a major rehabilitation of existing trunk lines.
 

 “The estimated cost of these improvements is approximately twenty three million dollars ($23,000,000). Due to the limited number of water and sewer customers and the high percentage of these families that are of low to moderate income, it is not feasible to expect customers to absorb these costs through rate increases.”
 

 With respect to funding recommendations, the committee first recommended “[a]n immediate implementation of a reasonable impact fee, to be paid by developers of new commercial, industrial, and residential properties.” Included in the -committee’s final recommendation was information regarding impact fees charged by other municipalities. Also during this time, Woods calculated the amount of impact fees that could be justified based on the capital improvements to the water and sewer systems needed to provide additional capacity for future growth.
 

 In February 2006, the City received a notice of violation from the Alabama Department of Environmental Management (“ADEM”) for overflows in the City’s sewer system. On May 30, 2006, Woods wrote a letter to ADEM proposing a series of projects that would both eliminate the overflows in the City’s system and expand and upgrade the system to provide for future growth. On September 14, 2006, the mayor and ADEM executed a consent order incorporating the projects proposed in Woods’s letter as well as improvements to the water system. The consent order set forth the following relevant facts:
 

 “1. [The City] operates a wastewater treatment facility known as the Pell City Dye Creek Waste Water Treatment Plant located on First Avenue North in Pell City, St. Clair County, Alabama. The wastewater treatment facility discharges pollutants from a point source into the Coosa River, a water of the state.
 

 [[Image here]]
 

 “4. The Department issued a National Pollutant Discharge Elimination System (hereinafter ‘NPDES’) Permit to [the City] on June 4, 2003, authorizing the discharge of pollutants from the Pell City Dye Creek [Wastewater Treatment Plant] to the Coosa River. The Permit requires that [the City] monitor its discharges and submit periodic Discharge Monitoring Reports (hereinafter ‘DMRs’) to the Department describing the results of the monitoring. The Permit also requires that [the City] maintain in good working order all systems used by [the City] to achieve compliance with the terms and conditions of the Permit.
 

 “5. On May 27, 2005, the Department received the Pell City Dye Creek WWTP 2003 Municipal Water Pollution Prevention (hereinafter ‘MWPP’) Annual Report. The report indicated that [the City] had experienced significant bypasses or sanitary sewer overflows (hereinafter ‘SSOs’) of untreated wastewater resulting from rain events. The 2003 MWPP Annual Report indicated 136 SSO events occurred prior to the head-works of the Wastewater Treatment Plant (hereinafter ‘WWTP’). No such events occurred at the WWTP. Furthermore, [the City] estimated that it implemented resolutions for 18 of the reported events so that future events at
 
 *998
 
 the same location are not anticipated. The report also indicated that [the City] had experienced one bypass or overflow event of untreated wastewater prior to the headworks of the WWTP due to equipment failure.
 

 “6. On May 11, 2005, the Department received [the] Pell City Dye Creek WWTP 2004 MWPP Annual Report. The report again indicated that [the City] had experienced bypasses or sanitary sewer overflows of untreated waste-water resulting from rain events. [The City] reported that fifty-one SSOs occurred prior to the headworks of the WWTP. No bypasses were reported to occur at the WWTP. Furthermore, [the City] reported none of the fifty-one SSOs had been fully resolved such that future events at the same location would likewise be prevented. The 2004 MWPP Annual Report also indicated that [the City] experienced two bypass or overflow events of untreated waste-water prior to the headworks of the WWTP due to equipment failure.
 

 “7. On February 6, 2006, the Department observed a major SSO event at the intersection of Golf Course Road and County Road # 4, leading to a discharge of perhaps several hundred gallons per minute of untreated sewage to Blue Springs, ultimately leading to Logan Martin Lake, for an extended period of time.
 

 “8. ADEM has also become aware that [the City] has historically pumped untreated sewage to Dye Branch in an attempt to prevent other SSO-related maintenance concerns (e.g. back up of sewage into homes).
 

 “9. The [City’s] WWTP is presently permitted to discharge 2.0 mgd, but has reported some monthly average flow rates exceeding the 2.0 mgd design flow, providing further evidence of the limited existing design capacity. The excessive flow rates reported by [the City] are in part the result of excessive infiltration and inflow.”
 

 The City adopted the ordinance to help finance the completion of the water- and sewer-system projects. The ordinance, as amended by Ordinance No. 2008-1967,
 
 [1]
 
 states:
 

 “SECTION 1. ESTABLISHMENT OF SEWER IMPACT FEES. The owner of any property not categorized in Section 4 below who or which connects said property to the City’s sewer system shall pay a nonrefundable impact fee in the amount of $2,300.00 for each unit on said property to be serviced by the City’s sewer system. Said fee is payable at the time a building permit is issued for said property. Said impact fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s sewer system.
 

 “SECTION 2. ESTABLISHMENT OF WATER CAPITAL RECOVERY FEES. The owner of any property not categorized in Section 4 below who or which connects said property to the City’s water system shall pay a nonrefundable capital recovery fee in the following amount:
 

 Size of
 
 Line_Fee_
 

 3/4"_$ 1,550.00_
 

 V_$ 1,974.00_
 

 1-1/2"$ 2,538.00
 

 
 *999
 
 ST_$ 4,089.00_
 

 ST_$15,510.00_
 

 4" and above$19,740.00
 

 for each unit on said property to be serviced, by the City’s water system. Said fee is payable at the time a building permit is issued for said property. Said water capital recovery fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s water system.
 

 “SECTION 3. DEFINITION OF ‘UNIT.’ A unit, for purposes of this Ordinance, is hereby defined as follows: A structure having a roof supported by columns or walls for the shelter, support, or enclosure of persons; and when supported by division walls from the ground up without ingress and egress provided between such divisions by suitable openings, each portion of such building so divided shall be deemed a separate unit. For residential purposes, any portion of a building used as a separate abode for a family shall be considered a ‘unit.’ For commercial and industrial purposes, any portion of a building used as separate quarters for the operation of a separate business shall be considered a ‘unit.’
 

 “SECTION 4. ESTABLISHMENT OF SEWER IMPACT AND WATER CAPITAL RECOVERY FEES FOR HOTELS/MOTELS, APARTMENTS, NURSING HOMES/ASSISTED LIVING FACILITIES, and HOSPITALS.
 

 “A. HOTELS/MOTELS.
 

 “1. SEWER IMPACT FEE. The owner of any property who or which constructs a hotel or motel on said property and connects said property to the City’s sewer system shall pay a nonrefundable sewer impact fee in an amount determined by multiplying the number of rooms in the hotel/motel by .46 by the amount set forth in Section 1 above. Said fee is payable at the time a building permit is issued for said property. Said impact fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s sewer system.
 

 “2. WATER CAPITAL RECOVERY FEE. The owner of any property who or which constructs a hotel or motel on said property and connects said property to the City’s water system shall pay a nonrefundable capital recovery fee in an amount determined by multiplying the number of rooms in the hotel/motel by .46 by the amount set forth for a 3/4 inch line in Section 2 above. Said fee is payable at the time a building permit is issued for said property. Said water capital recovery fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s water system.
 

 “B. APARTMENTS.
 

 “1. SEWER IMPACT FEE. The owner of any property who or which constructs apartments on said property and connects said property to the City’s sewer system shall pay a nonrefundable sewer impact fee in an amount determined by multiplying the number of apartments by .57 by the amount set forth in Section 1 above. Said fee is payable at the time a building permit is issued for said property. Said impact fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The
 
 *1000
 
 fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s sewer system.
 

 “2. WATER CAPITAL RECOVERY FEE. The owner of any property who or which constructs apartments on said property and connects said property to the City’s water system shall pay a nonrefundable capital recovery fee in an amount determined by multiplying the number of apartments by .57 by the amount set forth for a 3/4 inch line in Section 2 above. Said fee is payable at the time a building permit is issued for said property. Said water capital recovery fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s water system.
 

 “C. NURSING HOMES/ASSISTED LIVING FACILITIES.
 

 “1. SEWER IMPACT FEE. The owner of any property who or which constructs a nursing home or assisted living facility on said property and connects said property to the City’s sewer system shall pay a nonrefundable sewer impact fee in an amount determined by multiplying the number of beds in the nursing home/assisted living facility by .29 by the amount set forth in Section 1 above. Said fee is payable at the time a building permit is issued for said property. Said impact fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s sewer system.
 

 “2. WATER CAPITAL RECOVERY FEE. The owner of any property who or which constructs a nursing home or assisted living facility on said property and connects said property to the City’s water system shall pay a nonrefundable capital recovery fee in an amount determined by multiplying the number of beds in the nursing home/assisted living facility by .29 by the amount set forth for a 3/4 inch line in Section 2 above. Said fee is payable at the time a building permit is issued for said property. Said water capital recovery fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s water system.
 

 “D. HOSPITALS.
 

 “1. SEWER IMPACT FEE. The owner of any property who or which constructs a hospital on said property and connects said property to the City’s sewer system shall pay a nonrefundable sewer impact fee in an amount determined by multiplying the number of beds in the hospital by 1.02 by the amount set forth in Section 1 above. Said fee is payable at the time a building permit is issued for said property. Said impact fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s sewer system.
 

 “2. WATER CAPITAL RECOVERY FEE. The owner of any property who or which constructs a hospital on said property and connects said property to the City’s water system shall pay a nonrefundable capital recovery fee in an amount determined by multiplying the number of beds in the hospital by 1.02
 
 *1001
 
 by the amount set forth for a 3/4 inch line in Section 2 above. Said fee is payable at the time a building permit is issued for said property. Said water capital recovery fee is payable in addition to, and not in lieu of, any other fee now existing or hereafter established by the City. The fees generated pursuant to this section shall be used by the City only for capital improvements to the City’s water system.”
 

 The moneys collected pursuant to the ordinance are deposited into separate accounts specifically earmarked for water- and sewer-system improvement projects. There is no dispute that the anticipated revenues from the fees imposed by the ordinance will not exceed the projected costs of the improvements needed to add the capacity necessary for growth and that the revenues will actually be much less than the projected costs of adding that capacity. It is unquestioned that the Alabama Legislature has passed no specific enabling legislation authorizing the City to enact the ordinance, nor has the legislature passed legislation authorizing the City to charge and collect sewer-impact fees or water-capital-recovery fees.
 

 On May 14, 2007, following the City’s adoption of the ordinance, the home builders, who are in the business of residential construction and development, filed a “Class Action Complaint” against the defendants in the St. Clair Circuit Court, alleging: an inverse-condemnation claim under the Alabama Constitution; a violation of § 228, Ala. Const.1901; an inverse-condemnation claim under the United States Constitution, alleging due-process violations; a violation of the home builders’ equal-protection rights under the United States Constitution; the creation by the ordinance of an unconstitutional condition; and the imposition by the ordinance of an “unlawful tax.” With their complaint, the home builders simultaneously filed a motion for a preliminary injunction to stop the imposition of the fees authorized by the ordinance. On May 15, 2007, the home builders filed an amended complaint adding Attorney General Troy King as a defendant pursuant to § 6-6-227, Ala.Code 1975. The attorney general filed an “acceptance and waiver” on June 1, 2007, and is not a defendant.
 

 On June 28, 2007, the defendants filed a motion to dismiss, asking the trial court to dismiss all the named defendants except the City. The defendants also moved the trial court to dismiss the home builders’ inverse-condemnation claim brought under the Alabama Constitution. On July 16, 2007, the home builders filed a motion seeking to dismiss their class claims. On October 5, 2007, the trial court entered an order granting the home builders’ motion to dismiss their class claims. The order also dismissed, pursuant to the defendants’ motion, the city council as a defendant
 
 [2]
 
 and the home builders’ inverse-condemnation claim brought under the Alabama Constitution. On October 15, 2007, the defendants answered the home builders’ complaint and first amended complaint.
 

 On December 17, 2007, the home builders filed a “motion for partial summary judgment,” arguing that the ordinance was invalid on its face. On February 8, 2008, the trial court entered an order denying the home builders’ motion for a partial summary judgment.
 

 On September 8, 2008, the defendants filed a motion for a summary judgment. The home builders filed a response in op
 
 *1002
 
 position to the defendants’ summary-judgment motion on September 26, 2008.
 

 The case was set for a nonjury trial, which began on September 29, 2008. On November 10, 2008, the trial court entered a judgment for the defendants, upholding the validity of the ordinance. The home builders appealed.
 

 Standard of Review
 

 Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies: “ “When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.’ ”
 
 Smith v. Muchia,
 
 854 So.2d 85, 92 (Ala.2003) (quoting
 
 Allstate Ins. Co. v. Skelton,
 
 675 So.2d 377, 379 (Ala.1996)).
 

 “ ‘The
 
 ore tenus
 
 rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.’
 
 Hall v. Mazzone,
 
 486 So.2d 408, 410 (Ala.1986). The rule applies to ‘disputed issues of fact,’ whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence.
 
 Born v. Clark,
 
 662 So.2d 669, 672 (Ala.1995). The
 
 ore tenus
 
 standard of review, succinctly stated, is as follows:
 

 “ ‘[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.’ ”
 

 Reed v. Board of Trs. for Alabama State Univ.,
 
 778 So.2d 791, 795 (Ala.2000) (quoting
 
 Raidt v. Crane,
 
 342 So.2d 358, 360 (Ala.1977)). However, “that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.”
 
 Ex parte Board of Zoning Adjustment of Mobile,
 
 636 So.2d 415, 417 (Ala.1994). Concerning questions of law presented on appeal, this Court reviews a trial court’s ruling de novo.
 
 Ex parte Forrester,
 
 914 So.2d 855, 858 (Ala.2005).
 

 Discussion
 

 The home builders first argue that the ordinance is facially invalid. The home builders argue that the City lacked the power to impose the impact fees and capital-recovery fees because, they say, there is no constitutional provision or legislation providing the City with such taxing authority. However, as the defendants note in their appellate brief, in order to determine whether the City had the authority to impose the fees, this Court must first determine whether the impact fees and the capital-recovery fees are considered taxes or service fees.
 

 Concerning the foundational issue whether the fees imposed by the ordinance are taxes or service fees, the trial court determined that because the ordinance requires that the fees collected under the ordinance be used solely for capital improvements to the City’s water and sewer systems, the fees “are incident to the provision of a particular service, in this case water and sewer, [and] consequently do not constitute a general revenue tax.” We agree.
 

 Under Alabama law, fees charged by a municipality to defray the costs of providing its residents a specific service are generally considered service fees, as opposed to “taxes,” which are imposed to generate general revenue for a municipality. In
 
 Martin v. City of Trussville,
 
 376
 
 *1003
 
 So.2d 1089 (Ala.Civ.App.1979), a municipality adopted an ordinance “providing for the collection and disposal of garbage and the assessment of fees for providing such service.” 376 So.2d at 1091. A landowner challenged the ordinance arguing, among other things, that “the ordinance is a taxation ordinance exceeding the powers of taxation granted to a municipal corporation.” 376 So.2d at 1092. In holding that the fees imposed by the ordinance constituted a service fee, which a municipality has the power to impose independent of its powers of taxation, which must be expressly granted, the Court of Civil Appeals held, in pertinent part:
 

 “As to the issue of whether the municipal corporation exceeded its taxation authority, we note 71 Am.Jur.2d
 
 State and Local Taxation
 
 § 11 (1973) recognizes that all revenue received by a city is not ‘accurately’ characterized as a tax.... Oral testimony reveals the ordinance was passed to defray the costs of garbage collection. The charge involved is actually a fee for a service provided by the city which had previously been provided at no cost to its citizens. Consequently, we will consider the garbage charge in this case a ‘service charge’ rather than a tax.”
 

 376 So.2d at 1092.
 

 Ten years after
 
 Martin
 
 was decided, this Court further clarified the distinction between a fee and an unlawful tax in
 
 Town of Eclectic v. Mays,
 
 547 So.2d 96 (Ala.1989). In
 
 Mays,
 
 as in
 
 Martin,
 
 the issue was whether a municipal ordinance instituting a mandatory garbage-collection fee constituted an illegal tax. In analyzing the issue, the trial court found the following facts significant:
 

 “ ‘At all times relevant to this proceeding, the monies collected from the garbage service have been paid into the general fund of the Town of Eclectic. At no time have these garbage service monies been separated or segregated into any separate account.
 

 [[Image here]]
 

 '“... No money raised by the garbage service has been set aside for replacing capital equipment used in providing the garbage service. Any serious discussion concerning replacement of capital equipment began after the filing of this lawsuit.’ ”
 

 547 So.2d at 100. The trial court then held that “‘[t]he Town of Eclectic’s garbage service fees have been and are being used to provide general revenue for the town. Consequently, the garbage service fees are in reality a form of tax.’ ” 547 So.2d at 101. This Court affirmed the trial court’s judgment and held that the fees imposed by the ordinance constituted an unlawful tax, basing its decision on evidence indicating that “the garbage service fees were used to provide general revenue for the town and that revenues from the garbage service fees were spent in municipal departments other than the garbage department.” 547 So.2d at 103.
 

 Martin
 
 and
 
 Mays
 
 stand for the proposition that a fee imposed by a municipality is considered a service fee when the municipality charges a fee that is related to defraying the costs of a specific service and the moneys collected from the imposition of that fee are earmarked for that specific service and are not used as general revenue for the municipality. This principle is further illustrated in
 
 Lightwave Technologies, LLC v. Escambia County,
 
 804 So.2d 176 (Ala.2001), upon which the home builders rely. In
 
 Lightwave,
 
 Es-cambia County charged a telecommunications company a $1.00 per-linear-foot charge for each foot of a right-of-way it used in installing some 17 miles of fiber-optic cable along the county’s highway right-of-way. The charge purportedly re
 
 *1004
 
 lated to regulation of Escambia County’s rights-of-way. However, this Court held that the charge “was not a ‘fee,’ but was in reality an impermissible tax.” 804 So.2d at 180. This Court held that because “the charge was designed to generate revenue for the County” and the moneys collected pursuant to the charge were spent on other governmental purposes and “not for maintenance of the County’s rights-of-way,” the charge was an impermissible tax rather than a fee. 804 So.2d at 180.
 

 In this case, it is undisputed that the ordinance limits the use of the impact fees and the capital-recovery fees collected to capital improvements to its water and sewer systems; the fees are not considered general revenue to be used for any purpose. The evidence reveals that the City plans on using the fees imposed by the ordinance to defray the costs of providing water and sewer services to its residents. Further, it is undisputed that the fees are deposited in separate accounts specifically earmarked for capital improvements to the water and sewer systems. Therefore, the impact fees and the capital-recovery fees are properly characterized as service fees rather than taxes.
 
 [3]
 

 Simply characterizing the fees as service fees incident to the provision of a particular service does not, however, end our analysis. This Court must next determine whether the City had the authority to impose the service fees. This Court has held that “[a] municipality may exercise those powers that are explicitly granted to it by the legislature, as well as those powers that are necessarily implied from an express grant of power.”
 
 City of Birmingham v. Graffeo,
 
 551 So.2d 357, 360 (Ala.1989) (citing
 
 Spear v. Ward,
 
 199 Ala. 105, 74 So. 27 (1917)). Further, “[although municipalities exercise ‘such power ... as is conferred upon [them] by law,’ a municipality need not predicate its every action upon some specific express grant of power. Alabama’s cities possess certain implied powers that derive from the nature of the powers expressly granted to them by the legislature.”
 
 Wilkins v. Dan Hag-gerty & Assocs., Inc.,
 
 672 So.2d 507, 509 (Ala.1995).
 

 Several statutes expressly grant Alabama municipalities broad powers, including the power to construct, operate, and maintain water and sewer systems for the health and welfare of their residents:
 

 “Municipal corporations may from time to time adopt ordinances and resolutions not inconsistent with the laws of the state to carry into effect or discharge the powers and duties conferred by the applicable provisions of this title and any other applicable provisions of law and to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience of the inhabitants of the municipality, and may enforce obedience to such ordinances.”
 

 § 11-45-1, Ala.Code 1975.
 

 “All cities and towns in this state shall have the power to maintain the health and cleanliness of the city or town within its limits and within the police jurisdiction thereof.”
 

 § 11-47-130, Ala.Code 1975.
 

 “Cities and towns shall have the right to establish, purchase, maintain, and op
 
 *1005
 
 erate waterworks or contract for a supply of wholesome water for their inhabitants. ...”
 

 § 11-50-1, Ala.Code 1975.
 

 “All cities and towns may make all needful provisions for the drainage of such city or town, may construct and maintain efficient sanitary and stormwa-ter sewers or sewer systems, either within or without the corporate limits of the city or town, may construct and maintain ditches, surface drains, aqueducts, and canals and may build and construct underground sewers through private or public property, either within or without the corporate limits of such city or town, but just compensation must first be made for the private property taken, injured, or destroyed.”
 

 § 11-50-50, Ala.Code 1975.
 

 “Any city or town may extend or alter its sewer system and extend the mains whenever in the opinion of the city or town it may be necessary or expedient to do so.... ”
 

 § 11-50-52, Ala.Code 1975.
 

 “All cities and towns of this state shall have the power to establish or build drains and may require private or public premises to be connected with the sewer system for proper drainage or sanitation and shall have the power to regulate the manner of connection therewith.... ”
 

 § 11-50-53, Ala.Code 1975.
 

 “All cities and towns of this state shall have the power to prescribe the location and manner in which drainage from private premises may be disposed of and to prescribe the manner in which plumbing shall be constructed and to forbid the use of the same while out of order or defective and may discontinue or forbid the use of sinks, pits, cesspools, dry wells, and surface closets and may regulate and compel the connection of private or public premises with the sewer system of the town or city.... ”
 

 § 11-50-54, Ala.Code 1975.
 

 “All cities and towns of this state shall have the power to regulate privies, water closets, and septic tanks and the construction thereof and to compel the installation of same and to regulate the connection of such water closets with such septic tanks or with the sewerage system of the city or town.... ”
 

 § 11-50-55, Ala.Code 1975.
 
 [4]
 

 “Each municipality owning a sewer system shall have the power to establish and collect and from time to time alter charges for service furnished by or from said sewer system.... ”
 

 § 11-50-121, Ala.Code 1975.
 

 It is clear from the above statutory provisions that Alabama municipalities have been granted the authority to establish and maintain water and sewer systems for their residents. These statutes also make clear that the municipalities may charge their residents for such services. In light of the express statutory language, the City properly exercised its authority in imposing service fees for the home builders’ connections to the City’s water and sewer systems.
 

 Further, this Court has held that a municipality’s police power provides it with the authority to control sanitation in its municipal limits:
 

 “[B]ecause a municipality has the authority under its police powers to control sanitary matters within its limits by op
 
 *1006
 
 erating a sewer system, it has the corresponding authority to generate sufficient revenues from its residents, the persons who benefit from it most, to carry out its undertaking to operate a sewer system.”
 

 Board of Water & Sewer Comm’rs of the City of Mobile v. Yarbrough,
 
 662 So.2d 251, 254 (Ala.1995). In addition to the express statutory language previously quoted,
 
 Yarbrough
 
 makes clear that an Alabama municipality “has the authority under its police powers to control sanitary matters within its limits by operating a sewer system,” 662 So.2d at 254, which includes collecting sufficient revenues from its residents to carry out the task.
 

 The City’s imposition of service fees through its adoption of the ordinance is a valid exercise of the City’s powers, whether derived from the express statutory language granting it the authority to construct, operate, and maintain water and sewer systems or under the City’s police power allowing it to control sanitary matters within its municipal limits by operating a sewer system. Undoubtedly implied within the City’s power to construct, operate, and maintain its water and sewer systems is the power to charge the users of those systems fees to defray the cost of providing such services. Therefore, the City’s assessment of the service fees through its adoption of the ordinance was proper. The trial court’s holding determining that the ordinance is not facially invalid is without error.
 

 In further support of their argument that the City needed specific enabling legislation in order to adopt the ordinance, the home builders cite § 45-2-243.80 et seq., Ala.Code 1975 (“the Baldwin County legislation”), which authorizes Baldwin County to impose “impact fees.” The home builders argue that because enabling legislation was necessary before Baldwin County could impose such fees, the fees must be imposed under a municipality’s taxing authority and not its statutory authority or its police powers. Further, the home builders argue, the maxim of statutory construction
 
 expressio unius est exclu-sio alterius
 
 applies.
 

 The impact fees authorized by the Baldwin County legislation are distinguishable from the service fees in the present case. The Baldwin County legislation authorizes the imposition of impact fees on new development, which may be used to fund “governmental infrastructure” within the jurisdiction of the county or a municipality within the county. “Governmental infrastructure” is defined in the Baldwin County legislation as
 

 “[a]ny facilities, systems, or services that are owned and operated by or on behalf of a political subdivision for any of the following purposes:
 

 “a. Storm water, drainage, and flood control.
 

 “b. Roads and bridges.
 

 “e. Capital expenditures related to law enforcement and public safety, fire protection, emergency medical services, public park and recreational facilities, and public schools.
 

 “d. Maintenance and upkeep of facilities or resurfacing of roadways where needed because of the impact of new development.”
 

 § 45-2-243.81, Ala.Code 1975.
 

 Both sides also cite numerous cases from foreign jurisdictions. However, given that Alabama statutory law and this Court’s caselaw is directly applicable, there appears to be no reason to examine the caselaw from other jurisdictions.
 

 Next, the home builders argue that, even if the ordinance withstands a facial challenge, “the method of the computation of the fees” imposed through the ordinance is “arbitrary and unreasonable.”
 
 *1007
 
 Preliminarily, the home builders argue that the trial court erred by placing the burden of proving that the fees were arbitrary and unreasonable on the home builders. In so arguing, the home builders rely on
 
 Dolan v. City of Tigard,
 
 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), and
 
 Nollan v. California Coastal Commission,
 
 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Both
 
 Dolan
 
 and-
 
 Nollan
 
 involved the forced dedication of land from an individual to a municipal corporation. In those cases, the forced dedication was a result of an individualized adjudicative determination regarding specific parcels of property and not a generally applicable legislative action, such as the ordinance in the present case. The
 
 Dolan
 
 Court observed that the United States Supreme Court’s precedent concerning generally applicable land-use regulation was different from the challenged individualized adjudicative decision in two significant respects:
 

 “First, [the Supreme Court precedent] involved essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner’s application for a building permit on an individual parcel. Second, the conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city.”
 

 Dolan,
 
 512 U.S. at 385. The
 
 Dolan
 
 Court concluded that when a municipal corporation forces the dedication of land through an individualized adjudicative determination for a specific piece of property, the municipal corporation bears the burden of showing the reasonableness of the required dedication. The
 
 Dolan
 
 Court made clear, however, that this unique burden shifting did not apply to a challenge to a legislative action, such as the ordinance in the present case:
 

 “Justice STEVENS’ dissent takes us to task for placing the burden on the city to justify the required dedication. He is correct in arguing that in evaluating most generally applicable zoning regulations, the burden properly rests on the party challenging the regulation to prove that it constitutes an arbitrary regulation of property rights.
 
 See,
 
 e.g.,
 
 Village of Euclid v. Ambler Realty Co.,
 
 272 U.S. 365(1926). Here, by contrast, the city made an adjudicative decision to condition petitioner’s application for a building permit on an individual parcel. In this situation, the burden properly rests on the city.”
 

 512 U.S. at 391 n. 8.
 

 Accordingly,
 
 Dolan
 
 does not apply to generally applicable legislative enactments, such as the ordinance.
 
 [5]
 
 As the
 
 Dolan
 
 Court noted, in reviewing such ordinances, the burden rests on the party challenging the ordinance to prove that it is arbitrary and unreasonable. Alabama law supports this conclusion.
 

 It is well settled in Alabama that when challenging a municipal ordinance, the burden of proof rests on the challenger:
 

 “It is, without question, a settled rule of law in Alabama that:
 

 “‘municipal ordinances are presumed to be valid and reasonable, to be within the scope of the powers granted municipalities to adopt such ordinances, and are not to be struck down unless they are clearly arbitrary and unreasonable.’
 
 Cudd v. City of
 
 
 *1008
 

 Homewood,
 
 284 Ala. 268, 270, 224 So.2d 625 (1969).”
 

 Hall v. City of Tuscaloosa,
 
 421 So.2d 1244, 1247 (Ala.1982). It is therefore axiomatic that “an ordinance enacted by a local governing body ‘is presumed reasonable and valid, and that the burden is on the one challenging the ordinance to clearly show its invalidity.’ ”
 
 Brown v. Board of Educ. of Montgomery,
 
 863 So.2d 73, 75 (Ala.2003) (quoting
 
 Jefferson County v. Richards,
 
 805 So.2d 690, 706 (Ala.2001)). The trial court did not err by placing the burden of proof on the home builders to show that the ordinance was invalid, and the home builders do not dispute the application of the above Alabama law. Therefore, the trial court’s holding that the ordinance is presumed to be valid absent a showing by the home builders that it is clearly arbitrary and unreasonable is without error.
 

 The fact that the
 
 Dolan/Nolían
 
 standard does not apply to the case at hand nullifies two of the home builders’ other arguments. First, the home builders argue that, under
 
 Dolan/Nolían,
 
 the ordinance constitutes an unconstitutional condition that results in a taking of private property without compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. The home builders argue that for a municipal corporation to impose such a condition it must satisfy the “rough proportionality” standard set forth in
 
 Dolan.
 
 However, in
 
 City of Monterey v. Del Monte Dunes at Monterey, Ltd.,
 
 526 U.S. 687, 702, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), the United States Supreme Court held that “we have not extended the rough-proportionality test of
 
 Dolan
 
 beyond the special context of exactions-land-use decisions conditioning approval of development on the dedication of property to public use.” Therefore, for this reason as well, the
 
 Dolan/Nolían
 
 standard does not apply to this case.
 

 Second, based on the home builders’ argument that the
 
 Dolan/Nolían
 
 standard applies, the home builders conclude that “the trial court committed reversible error in dismissing their inverse condemnation claim.” (Home builders’ brief, at 55.) This is a peculiar contention given that it was the home builders’ inverse-condemnation claim brought under the Alabama Constitution that was dismissed, and not its inverse-condemnation claim brought under the United States Constitution. The home builders appear to base their allegation that the trial court’s dismissal of the inverse-condemnation claim brought under the Alabama Constitution was error on federal law. This analysis is flawed. In dismissing the home builders’ state-law inverse-condemnation claim, the trial court held that the imposition of the impact fees and the capital-recovery fees “did not constitute a taking or condemnation as contemplated under the law.” The home builders present no legal authority concerning what constitutes a “taking” under Alabama law, and it is not this Court’s function to create legal arguments for the appellant. Rule 28(a)(10), Ala. R.App. P.;
 
 see also Asam v. Devereaux,
 
 686 So.2d 1222, 1224 (Ala.Civ.App.1996) (“[A]ppellate courts do not, ‘based on undelineated propositions, create legal arguments for the appellant.’
 
 McLemore v. Fleming,
 
 604 So.2d 353, 353 (Ala.1992). This court will address only those issues properly presented and for which supporting authority has been cited.”).
 

 Next, the home builders argue that, even if the service fees were properly imposed, they were improperly calculated and, thus, arbitrary and unreasonable; the home builders contend that there is no relationship between the fees charged and the benefits realized by the home builders. The home builders fail to cite any Alabama law to support their argument, instead
 
 *1009
 
 urging this Court to adopt a Florida standard. It is not necessary to do so, however, because Alabama law has already set forth the standard for determining if an ordinance imposing service fees is arbitrary or unreasonable.
 

 In
 
 Densmore v. Jefferson County,
 
 813 So.2d 844, 853 (Ala.2001), the appellants argued before this Court that a county ordinance imposing storm-water fees was an unconstitutional tax because “there [was] no relationship between the amount of the storm-water fee imposed on a parcel of property and the amount of benefit the property owner receives.” This Court initially held that the storm-water fee was not a tax, but a service fee. This Court went on to agree with the county’s argument in defense of the ordinance “that Alabama law does not require that fees precisely comport with the benefits provided to property owners.” 813 So.2d at 853. In so holding, this Court relied on
 
 Yar-brough, supra,
 
 as follows:
 

 “This Court, in
 
 Board of Water & Sewer Commissioners of the City of Mobile v. Yarbrough,
 
 662 So.2d 251 (Ala.1995), upheld the rationale that, for a fee to be sustained as valid, the benefit conferred on property owners need not relate directly to the exact amount paid. The Court said that a ‘substantial indirect benefit’ to a property owner would suffice to uphold the validity of a fee. 662 So.2d at 255. In
 
 Yarbrough,
 
 the Board was created to operate Mobile’s water and sewer systems and to address such problems as the fact that ‘raw sewage was being emptied into Mobile Bay and other public waterways.’ Id. at 252. The plaintiff, whose property was not connected to the sewer system, sued the Board when it began charging residents who were not connected to its sewer system a flat monthly fee purportedly relating to sewer service. Formerly, the Board had charged a combined fee for water and sewer services to all residents, whether they used the sewer service or not. This Court upheld the Board’s prior fee structure and held that a municipal utility is authorized to set fees so as to create a surplus. The Court also held that any surplus resulting from the operation of the water service could lawfully be used for the sewer service, which, this Court found[,] bene-fitted all residents, ‘regardless of whether the customer received sewer service.’ Id. at 253. This Court also upheld the new fee structure, which charged a separate sewer-related fee to residents who lacked sewer service, concluding that every member of the community received a ‘substantial indirect benefit’ from the sewer service, regardless of whether the resident was connected to the system. This Court agreed with the Board’s statement in a 1954 resolution that ‘[t]he citizens of the City of Mobile ... are directly or indirectly affected by the results of the pollution of [public] waters and the beneficial results to be obtained by the elimination of the pollution will be a public benefit to the entire community and citizens thereof.’ 662 So.2d at 254.”
 

 Densmore,
 
 813 So.2d at 854. This Court concluded that “a valid fee may be sustained based upon the indirect benefit or a public benefit to the persons assessed the fee.” 813 So.2d at 855.
 

 In the present case, as in
 
 Dens-more
 
 and
 
 Yarbrough
 
 the service fees imposed by the ordinance certainly pass the “substantial indirect benefit” test. That test does not require a showing that each person against whom the service fees are assessed receives a proportional direct benefit. Instead, all that need be shown is that each person against whom the service fees are assessed received at least a substantial indirect benefit. Owners of property who wish to connect to the City’s
 
 *1010
 
 water and/or sewer system will certainly benefit. It cannot seriously be contested that there is not at least a substantial indirect benefit from being connected to the City’s water and/or sewer system.
 

 In the same vein, the home builders spend considerable time discussing the methods the City used in arriving at the amount of the service fees assessed. The home builders allege that the City arbitrarily arrived at the amount to charge for the service fees. However, based on the evidence in the record, this allegation is without merit. As this Court stated in
 
 Densmore:
 
 “Alabama law does not require that fees precisely comport with the benefits provided to property owners.” 813 So.2d at 853. The City conducted numerous studies to determine the cost of correcting the City’s problems with its water and sewer systems and the cost of expanding its water and sewer systems to allow for further and future development. The City relied on experts, engineers, and other municipalities’ studies in arriving at the appropriate amount to charge. The City did not act arbitrarily in assessing the amount of the service fees, and the home builders certainly received a benefit.
 

 Therefore, the trial court’s holding that the ordinance is not arbitrary and unreasonable is without error.
 

 Next, the home builders argue that the ordinance violates their due-process rights under the United States Constitution. The home builders rely on
 
 Norwood v. Baker,
 
 172 U.S. 269, 19 S.Ct. 187, 43 L.Ed. 443 (1898), and argue that to the extent the service fees in the present case exceed the benefit bestowed upon the home builders, such excess constitutes a taking under the Fifth Amendment to the United States Constitution. In
 
 Norwood,
 
 the Supreme Court of the United States held, in pertinent part:
 

 “In our judgment, the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use without compensation. We say ‘substantial excess,’ because exact equality of taxation is not always attainable.... ”
 

 172 U.S. at 279. However, the Supreme Court of the United States has since held that “[t]his Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services.”
 
 United States v. Sperry Corp.,
 
 493 U.S. 52, 60, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). “On the contrary, the Just Compensation Clause ‘has never been read to require the ... courts to calculate whether a specific individual has suffered burdens ... in excess of the benefits received’ in determining whether a ‘taking’ has occurred.” 493 U.S. at 61 n. 7 (quoting
 
 Keystone Bituminous Coal Ass’n v. DeBenedictis,
 
 480 U.S. 470, 491 n. 21, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)). Rather, “[a]ll that [the Supreme Court of the United States has] required is that the user fee be a ‘fair approximation of the cost of benefits supplied.’ ” 493 U.S. at 60 (quoting
 
 Massachusetts v. United States,
 
 435 U.S. 444, 463 n. 19, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978) (plurality)). Further, “a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services. ‘A governmental body has an obvious interest in making those who specifically benefit from its services pay the cost....’” 493 U.S. at 63 (quoting
 
 Massachusetts v. United States,
 
 435 U.S. at 462).
 

 As discussed above, the home builders certainly received a benefit from the availability of water and of sewage disposal.
 
 *1011
 
 Further, the City determined what the cost of improving its water and sewer systems to allow areas of new development to connect to its water and sewer systems. The moneys collected from the service fees imposed in the present case will not cover the amount required to repair and improve the City’s water and sewer systems. The service fees are not in “substantial excess” of the benefit bestowed upon the home builders; rather, the fees are a “fair approximation of the cost of benefits supplied.” Therefore, the trial court’s holding that the ordinance does not violate the home builders’ due-process rights is without error.
 

 Next, the home builders argue that the ordinance denies them “the right to equal protection of the law.” (Home builders’ brief, at 73.) In
 
 City of Cleburne v. Cleburne Living Center,
 
 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court of the United States held:
 

 “The Equal Protection Clause of the Fourteenth Amendment commands that no State shall ‘deny to any person within its jurisdiction the equal protection of the laws,’ which is essentially a direction that all persons similarly situated should be treated alike.... The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.... When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, ... and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.”
 

 Further,
 

 “a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.... Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose .... Further, a legislature that creates these categories need not ‘actually articulate at any time the purpose or rationale supporting its classification.’ ... Instead, a classification ‘must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.’ ...
 

 “A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. ‘[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.’ ... A statute is presumed constitutional, ... and ‘[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it,’ ... whether or not the basis has a foundation in the record.”
 

 Heller v. Doe,
 
 509 U.S. 312, 319-21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).
 

 The home builders make a bald accusation that the ordinance is “irrational and wholly arbitrary.” However, it is undisputed that the service fees imposed by the ordinance are intended to help defray the costs of providing water and sewer services to the home builders’ property by charging new users a fee for the costs of adding the capacity needed to service those new users. Such a fee certainly has a rational basis to a legitimate government interest. The service fees have a rational basis in that they are related to the City’s interest of fulfilling its duty to provide sanitation to its residents, as discussed above. The trial court’s holding that the ordinance does not violate the home build
 
 *1012
 
 ers’ equal-protection rights is without error.
 

 Next, the home builders argue that the fees imposed by the ordinance “violate[] Section 223 of the Alabama Constitution.” (Home builders’ brief, at 76.) This argument is based on the home builders’ earlier argument that the fees imposed by the ordinance are taxes and not service fees. However, based on our holding that fees imposed by the ordinance are service fees imposed under the City’s police power or under express statutory power, and not taxes under § 223, this argument must fail.
 

 Lastly, the home builders argue that the fees imposed by the ordinance are “not a regulatory measure.” (Home builders’ brief, at 83.) However, this argument has already been addressed in our holding that the ordinance imposes a service fee and not a tax.
 

 Conclusion
 

 Based on the foregoing, we affirm the trial court’s judgment.
 

 AFFIRMED.
 

 COBB, C.J., and STUART, SMITH, PARKER, and SHAW, JJ., concur.
 

 [1]
 

 . Ordinance No. 2008-1967 amended the ordinance by adding Section 4, which established the sewer-impact fees and the water-capital-recovery fees for hotels or motels, apartments, nursing homes or assisted-living facilities, and hospitals.
 

 [2]
 

 . Accordingly, from this point forward, the term "defendants” will no longer include the city council.
 

 [3]
 

 . In a related argument, the home builders argue that although the ordinance limits the use of the fees to capital improvements to the water and sewer systems, nothing prevents the City from redefining the term "capital improvements” and from thereby using the fees as general revenue for the City. This argument, however, is pure speculation. The home builders point to no evidence indicating that an effort to redefine "capital improvements” has been attempted or will be attempted.
 

 [4]
 

 .
 
 See Town of Leeds v. Cason,
 
 217 Ala. 444, 445, 116 So. 519, 519 (1928) (stating that the predecessor statute to § 11-50-55 "is an exercise of the police power in the conservation of the public health rather than the taxing power, as in case of local assessments for better-ments to the property”).
 

 [5]
 

 . The defendants also note that the
 
 Do-lan/Nollan
 
 burden shifting does not apply here because its application has been limited to cases involving the forced dedication of land, not cases involving the payment of fees.